[No. S030610. Dec. 30, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM GONZALES HARRIS, Defendant and Appellant.

**COUNSEL**

David McNeil Morse, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Margaret Garnand Venturi and Alison Elle Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—Defendant William Gonzales Harris was convicted by a jury of first degree murder, kidnapping for robbery, kidnapping, second degree robbery, second degree (commercial) burglary (two counts), first degree (residential) burglary, grand theft of a firearm, possession of a concealed firearm in a vehicle, fraudulent use of an automatic teller machine (ATM) access card (two counts), and auto theft (two counts). (Pen. Code, §§ 187, 209, subd. (b), 207, 211, 212.5, 459, 460, 487, former subd. 3, 12025, subd. (a), 484g; Veh. Code, § 10851.) He was sentenced to state prison for 25 years to life for first degree murder, with an aggregate determinate sentence of 28 years 8 months for the remaining offenses.[1]

Among other claims, defendant contended on appeal that the trial court erred in instructing the jury on the "immediate presence" element of robbery.

---

[1] A term of life imprisonment for the kidnapping for robbery conviction was stayed pursuant to Penal Code section 654.

(Pen. Code, § 211.) Pursuant to our holding in *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376] (*Hayes*), which case was decided after defendant's trial but while this matter was pending on appeal, the Court of Appeal found instructional error. The court went on to find the error prejudicial to the robbery, kidnapping for robbery, and first degree murder convictions. In all other respects the judgment was affirmed.

As will be explained, the Court of Appeal correctly concluded under our holding in *Hayes* that the jury was misinstructed on the "immediate presence" element of robbery. We granted the People's petition for review to consider the soundness of the appellate court's further conclusion that the instructional error was prejudicial. As will appear, we conclude the Court of Appeal erred in reversing defendant's convictions of robbery, kidnapping for robbery, and first degree murder.

I

On the morning of Tuesday, January 16, 1990, defendant, who was 21 years old at the time, and 3 companions (Shon Maple, age 20;[2] Valdez F., age 15; and Frank P., age 14[3]) drove in defendant's car from Stockton to the Sacramento area to break into and steal cars and car stereos. They stole stereo equipment, various other items, and a Mercury Cougar, which they drove back to Stockton.

Later that evening, Maple, Valdez F. and Frank P. drove around Stockton in the stolen Mercury while defendant remained at Maple's house.[4] During this foray they spotted a Mazda RX7 parked in an office complex parking lot. They stopped to examine the vehicle; while they were looking inside the car alarm went off. The owner of the Mazda, Martin Atherton, emerged from an office building, looked in the direction of the group, and told them he was going to call the police. The three chased Atherton back into his office

---

[2]Prior to defendant's trial, Maple successfully moved to sever his case from defendant's.

[3]Most of the evidence covering the events from the time of the kidnapping of victim Martin Atherton up to his murder came from the eyewitness testimony of Frank P. The minor was originally charged with murder, kidnapping, robbery, burglary and auto theft; he thereafter agreed to testify truthfully for the prosecution and plead guilty to kidnapping in exchange for the prosecution's dismissal of the remaining charges and recommendation of an eight-year commitment to the California Youth Authority.

[4]Defendant testified on direct examination that he was an "experienced" car thief, that he had trained Maple and the two minors in auto burglary, and that as they became more experienced his three companions—whom he referred to at one point as "the guys [in] my group"—would go out to commit thefts without him in "the normal routine." Defendant testified that on this night he declined to go out with the group, but told them they could use the stolen Mercury. Defendant would frequently stay over at Maple's house since Maple's sister was defendant's girlfriend.

building, hit him in the head with a flashlight to subdue him, then obtained his car keys from his person and placed him inside the Mazda. Outside of Atherton's presence, Maple told Frank P., "We have to kill him." Frank P. voiced an objection. Valdez F. suggested they "take him to [defendant]." The three then kidnapped Atherton and returned in both cars to Maple's house.

Upon arriving, Maple and Valdez F. entered the house while Frank P. stood guard over Atherton in the Mazda. By defendant's own testimony, he gave Maple handcuffs to restrain the victim, assertedly because he did not want any of "the guys out of [his] group" getting hurt by Atherton. He also gave Maple a blindfold to use on Atherton because he did not want the victim to see or identify him. Defendant waited until Maple returned to the Mazda and handcuffed and blindfolded Atherton before himself going outside and getting into the driver's side of the vehicle. Defendant testified that Atherton was seated next to him in the passenger seat of the Mazda and that Valdez F., who was also inside the car, handed him Atherton's wallet when he (defendant) asked for the victim's identification. Defendant testified he removed the money from Atherton's wallet and pocketed it. Atherton's wallet also contained several credit cards.

Maple next told defendant he wanted to return to Atherton's office building to clean up blood from the prior struggle. Defendant thought it would be better if the entire group returned together to Atherton's office; he testified on direct examination that he wanted to keep the victim "on the move." Defendant drove Atherton's Mazda with Valdez F. as a passenger and the victim still blindfolded and handcuffed in the back of the car. Maple drove the stolen Mercury with Frank P. as a passenger. When they arrived at the victim's office complex, defendant, Maple and Frank P. went inside, using Atherton's key, while Valdez F. stood guard over Atherton in the parking lot. Defendant, himself a former security guard, testified he had seen a Bay Alarm card in the victim's wallet and planned to straighten up the offices, lock them, and then "call in" Atherton's security code number as he imagined the victim routinely would have done. Maple tried to clean up the blood; then he found a box containing cash and took some of it.

Defendant, Maple and Frank P. returned to the parking lot. After Maple determined that Atherton's key fit the neighboring office building, defendant, Maple, and Valdez F. went inside that building while Frank P. remained behind guarding Atherton. According to defendant's testimony, the three "broke into small groups" and proceeded to loot a floor of "fancy executive offices." Among the items removed to the vehicles were five briefcases, electronic equipment and a large green safe. Maple returned to the first office building to retrieve a compact disc player.

Defendant admitted the group then drove to Atherton's residence for the purpose of stealing additional items. The victim, still blindfolded and handcuffed, was transferred to the Mercury. Maple drove that vehicle, with Frank P. as a passenger, while defendant continued driving the Mazda, with Valdez F. as his passenger. Maple parked the Mercury around the corner from Atherton's residence. Frank P. remained outside guarding the victim while defendant, Maple, and Valdez F., again using a key from Atherton's key ring, entered the victim's home and looted it. "Two or three suitcases" full of items were removed from the victim's residence to the vehicles, including firearms, ammunition, leather jackets, and ATM cards from Atherton's safe, which defendant retained in his possession. Defendant cautioned the others not to ransack the home, explaining that a friend or relative of the victim might possibly have a key and come looking for him.

Defendant next directed the group to an isolated park infrequently patrolled by the police in order to examine the loot and give himself more time to "think." Defendant took out a nine-millimeter semiautomatic pistol, commenting that it was "a beauty." The evidence suggested defendant retained possession of the pistol on his person during the remainder of the episode. According to Frank P.'s testimony, defendant next threatened Atherton in order to obtain the access codes for his ATM cards, telling the victim he would "probably never see or hear" defendant again. The group then proceeded to two branches of Atherton's bank where defendant unsuccessfully attempted to withdraw money from Atherton's accounts, finding the ATM's out of cash at that late hour.

With daylight approaching, the group once again returned to Maple's house to drop off the guns. Defendant testified: "These are just kids. I respect firearms and I know how to treat them properly, but these are just kids and they don't."[5] The group next followed Maple's suggestion that they take the victim to a motel room. Defendant selected the motel. The motel clerk who registered Maple and defendant estimated they arrived between 7:30 and 8 a.m. on January 17. (Computer records reflected the computer in Atherton's office was last used at 3:08 a.m. on the 17th.) Defendant paid for the room with cash from Atherton's wallet. Inside the motel room, Atherton's head wounds were cleaned and his blindfold removed to permit him to rinse his eyes. During this time defendant and the others hid their faces from his view. Afterwards, the victim, still in handcuffs, was again blindfolded.

---

[5]Defendant testified further that en route back to Maple's house, with all the stolen property and guns still in the two cars and the victim still blindfolded and handcuffed in the Mazda which defendant was driving, the group wound up "racing" the Mazda against the Mercury down the city streets, screeching their wheels and ultimately causing a flat tire on the Mazda, which had to be changed and later fixed.

Defendant made several excursions from the motel while Atherton was being held captive there. On each trip he drove the victim's Mazda; in some instances Maple, Valdez F. or Frank P. accompanied him, although at least one in the group always remained behind to guard Atherton. During these trips, defendant used Atherton's ATM and American Express cards to obtain cash from the victim's accounts and purchase food and various other items at a shopping mall. According to defendant, throughout their stay at the motel it was he who made the decisions for the group and determined their next moves. Defendant fraudulently obtained over $1,600 in the aggregate from Atherton's various bank and credit card accounts. At some point defendant and Valdez F. left the motel and returned to Maple's house.

Later that same night, Maple telephoned his house, then left the motel with the victim and Frank P., driving in the Mercury back to his residence. According to Frank P., Maple went inside briefly, leaving him guarding the victim, then came back outside. When Valdez F. came out with a shotgun (which had been stolen from Atherton's home) wrapped in a sleeping bag and placed it in the trunk of the Mercury, Maple momentarily ran back inside the home (defendant was still present in the residence). Maple, Valdez F. and Frank P. then drove off with Atherton, Maple explaining to the others that defendant either would not wake up or did not want to come.

Maple drove to a rural area in Alameda County. En route, Valdez F. directed Atherton to give him his wristwatch. The victim complied. Maple stopped the car and everyone got out. Maple removed Atherton's handcuffs and blindfold. Valdez F. took the shotgun from the trunk, directed Atherton to "go right about over there," and shot him in the back, causing the victim to fall down a hill. Valdez F. walked down the hill and shot Atherton a second time. He and Maple then dragged Atherton's body farther down the hill and hid it under the sleeping bag.

When Maple, Valdez F. and Frank P. returned to Maple's house, defendant was allegedly just awakening. Valdez F. told defendant, "we did it." When defendant asked why, Valdez F. explained they "got tired of the man being around." Defendant replied: "So you just get tired of him being around [and] you go waste the fucker. We could have kept him a couple more days or a little bit longer explaining why he hasn't been at work for a couple days, why things were messed up." Defendant took the shotgun and some shotgun shells and, along with Maple, returned to the murder scene and better concealed Atherton's body.

Upon returning to Stockton in the early morning of January 18, defendant and Maple again used Atherton's bank cards to obtain additional cash from

his accounts which they used to make various purchases. The group's demise unfolded when they attempted to sell the victim's car and the prospective buyers, recognizing the vehicle from a newspaper account of the disappearance of Atherton and his Mazda, notified police. Upon his arrest, defendant had Atherton's wallet, identification, American Express and bank ATM cards in his possession. Thereafter, defendant gave three statements to police, one during a four-hour interview that was transcribed by a court reporter and later read to the jury. Defendant also led police to the murder scene where Atherton's body was recovered.

## II

■ As defined in Penal Code section 211, and as essentially incorporated in CALJIC No. 9.40 (the key robbery instruction given below), "[r]obbery is the felonious taking of personal property in the possession of another, from his person *or immediate presence*, and against his will, accomplished by means of force or fear." (Italics added.) Relying on the holdings in *People v. Miramon* (1983) 140 Cal.App.3d 118, 124 [189 Cal.Rptr. 432], and *People v. Brown* (1989) 212 Cal.App.3d 1409, 1419 [261 Cal.Rptr. 262] (hereafter *Miramon-Brown*), the trial court below further defined the element of "immediate presence" for the jury as follows: "The act of robbery is deemed to have occurred within the immediate presence of the victim *as long as the victim perceived any overt act connected with the commission of the offense. Any and all sensory perceptions of the victim are to [be] considered in determining presence.*" (Italics added.)

In *Hayes, supra*, 52 Cal.3d 577, we rejected the *Miramon-Brown* definition of immediate presence. We observed that, in contrast to that instruction which required that the victim " 'perceive[] any overt act connected with the commission of the offense,' " "[t]he generally accepted definition of immediate presence . . . is that ' "[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." ' [Citations.] Thus, the Court of Appeal stated in *People v. Bauer* (1966) 241 Cal.App.2d 632, 642 [50 Cal.Rptr. 687], that "immediate presence" ' "must mean at least an area within which the victim could reasonably be expected to exercise some physical control over [her] property." ' (Quoting from *Spencer v. United States* [(D.C. Cir. 1940) 116 F.2d 801 (73 App.D.C. 98)], at p. 802.)" (*Hayes, supra*, 52 Cal.3d at pp. 626-627.)

We reasoned in *Hayes* that a jury charged with the "perception of any overt act" definition of "immediate presence" might improperly view *the*

*forcible acts themselves* as "overt acts" satisfying the "immediate presence" requirement. We concluded that instructing a jury with the *Miramon-Brown* definition effectively rendered the "immediate presence" element "devoid of all independent meaning, making it redundant with the 'force or fear' element." (*Hayes, supra,* 52 Cal.3d at p. 628.) Because the robber in *Hayes* had assaulted and killed his victim, the jury could reasonably have concluded under the erroneous instruction that the "immediate presence" requirement was satisfied by the *fatal assault,* itself an "overt act connected with the commission of the offense" that unquestionably occurred in the victim's immediate presence. We expressly disapproved the *Miramon-Brown* instruction, adopting in its stead the "prevailing American rule" definition of "immediate presence" described above. (*Hayes, supra,* 52 Cal.3d at p. 628, fn. 10; see also *People* v. *Webster* (1991) 54 Cal.3d 411, 440 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*).)

The Court of Appeal in the present case correctly concluded that the trial court's special instruction defining "immediate presence" was the functional equivalent of the *Miramon-Brown* instruction we disapproved in *Hayes.* The trial court below can hardly be faulted for applying the expansive definition of "immediate presence" set forth in *People* v. *Miramon, supra,* 140 Cal.App.3d at page 124, and *People* v. *Brown, supra,* 212 Cal.App.3d at page 1419, cases that were "good law" when defendant was tried in the summer of 1990. Nonetheless, because the faulty instruction, which failed to give appropriate effect to the legislative definition of the "immediate presence" element of robbery, was specifically disapproved in *Hayes* while defendant's appeal was pending, he is entitled to the benefit of our holding in that case. (See, e.g., *People* v. *Ballard* (1969) 1 Cal.App.3d 602, 606 [81 Cal.Rptr. 742].) Accordingly, we affirm that portion of the decision of the Court of Appeal finding the trial court erred in specially defining "immediate presence" for the jury.

III

The question remains whether the instructional error was prejudicial to the first degree murder, kidnapping for robbery, and robbery convictions. As a threshold matter, the Attorney General urges us to apply the *Watson* "miscarriage of justice" standard. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) However, as we explained in *Hayes,* "[b]ecause the jury was misinstructed on an element of the offense of robbery, reversal of the robbery conviction is required unless we are able to conclude that the error was harmless beyond a reasonable doubt. (*People* v. *Hernandez* (1988) 46 Cal.3d 194, 210 [249 Cal.Rptr. 850, 757 P.2d 1013]; *People* v. *Odle* (1988) 45 Cal.3d 386, 414-415 [247 Cal.Rptr. 137, 754 P.2d

184].)" (*Hayes, supra,* 52 Cal.3d at p. 628; see *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (*Chapman*).)

The prosecution in this case essentially asked the jury to convict defendant of robbery, either as a direct perpetrator or as an aider and abettor, based on the taking of any one or all of the following items: (1) Atherton's car keys and car; (2) Atherton's wallet and its contents; (3) the items from Atherton's office; or (4) the items from Atherton's house. The Court of Appeal expressly concluded that the taking of Atherton's car, and by implication the taking of his wallet and its contents, "as a matter of law" (to use the appellate court's phraseology) satisfied the requirement for robbery that property be forcibly taken from the victim's "person or immediate presence," a conclusion we agree with as explained more fully below. The appellate court found the two remaining "taking theories" advanced by the People more troublesome: the taking of items from Atherton's office, and the taking of items of personal property from his home.

The Court of Appeal reasoned: "[W]e cannot be certain the jury based its general robbery verdict on [the takings directly from Atherton's person]. Takings that defendant directly perpetrated at Atherton's offices and house were also presented to the jury as a basis for convicting defendant of robbery. During the office takings, Atherton was held captive in his car in the office parking lot; it was estimated he was 35 feet from the first office and 80 feet from the second. . . . During the house takings, Atherton was again captive in a parked car, this time 'around the corner of the same block' apparently six or seven houses away. . . ." The Court of Appeal was clearly troubled by the respective distances between the home and office premises from which the "takings" were accomplished, and the locations of the parked cars in which the victim was being restrained while the lootings took place. The court at one point in its opinion appeared to be applying the *Chapman* standard when it concluded: "With respect to the office and house takings, 'a reasonable finder of fact could conclude either that the property was not so distant as to be beyond the victim's control and protection, or that it was too distant to be in the victim's immediate presence at the time the force was used. Because the issue of immediate presence could reasonably have been decided either way, we are unable to declare that the misinstruction on this element of robbery was harmless beyond a reasonable doubt.' " (Fns. omitted; quoting *Hayes, supra,* 52 Cal.3d at p. 629.)

The Court of Appeal further indicated, however, that it was placing principal reliance on this court's opinion in *People* v. *Green* (1980) 27

Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*)[6] in support of its conclusion that the *Miramon-Brown* instructional error was prejudicial. The court reasoned that two of the four "taking theories"—the taking of items from Atherton's offices, and the taking of items from his home—were rendered "legally impermissible theories of guilt" as a result of the misinstruction. The court concluded that because those two taking theories "cannot be resolved in favor of guilt as a matter of law," reversal is required since "the reviewing court cannot determine from the record on which theory the jury relied." (Paraphrasing *Green, supra,* 27 Cal.3d at p. 69.)

For reasons next explained, we conclude that the Court of Appeal's prejudice analysis was flawed. Critically, it erred in applying *Green*'s rule of reversal to the facts of this case.

In *Green, supra,* 27 Cal.3d 1, the defendant was convicted of first degree murder, robbery, and kidnapping. Special circumstance allegations that the murder was committed during the commission of robbery and kidnapping were found true. The portion of *Green* arguably relevant here (by analogy) involved the kidnapping count, the related kidnapping special circumstance, and the "asportation" requirement for kidnapping. (*Id.* at pp. 62-74.)

In *Green* we identified three distinct segments of asportation of the victim upon which the jury could have based its kidnapping verdict. (*Green, supra,* 27 Cal.3d at pp. 62-63.) As regards the first segment, we found the trial court misinstructed the jury on the law: the facts were "undisputed" that fraud, *not* force or fear, was the means by which the victim was induced to go on the automobile ride that constituted the first segment of asportation. The Attorney General conceded it was therefore error to instruct the jury that asportation by fraud alone could support a conviction of simple kidnapping in California. (*Id.* at pp. 63-64.) Regarding the second segment of asportation, driving the victim to the murder scene, we found no error. The third occurred when the victim was forced to walk from the parked car to the spot where she was murdered. (*Id.* at pp. 63, 65.) We found that the distance she walked, about 90 feet, was "insufficient as a matter of law" to satisfy the asportation requirement for kidnapping and support the verdict finding defendant guilty of that offense. (*Id.* at p. 67.)

Having found clear legal error as to two of the three possible segments of asportation in *Green*, we went on to consider whether such errors prejudiced the kidnapping verdict. We could not determine from the record whether the jury had based its verdict on either of the *"legally insufficient* segments of

---

[6]Overruled on an unrelated point in *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].

[the victim's] asportation." (*Green, supra,* 27 Cal.3d at p. 67, italics added.) The jury instruction the court had given regarding the definition of asportation for kidnapping advised the jury only that the asportation of the victim had to be " 'for a substantial distance, that is, a distance more than slight or trivial.' " (*Green, supra,* 27 Cal.3d at p. 68, quoting *People* v. *Stanworth* (1974) 11 Cal.3d 588, 601 [114 Cal.Rptr. 250, 522 P.2d 1058].) Nothing in the instructions had informed the jury in *Green* that, *as a matter of law,* neither the first nor third segments of asportation could validly have supported a kidnapping verdict. Under those circumstances, we applied the following rule in *Green:* "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others *legally incorrect,* and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (27 Cal.3d at p. 69, italics added.) In using the terminology "legally incorrect theory" in *Green,* we were therefore referring specifically to instructional error, or a "legally incorrect" theory of the case which, if relied upon by the jury, could not *as a matter of law* validly support a conviction of the charged offense.[7]

Under the facts of the present case, it cannot be said that the misinstruction with the *Miramon-Brown* characterization of "immediate presence" resulted in the presentation to the jury of a "legally insufficient" theory of the case within the meaning of *Green.* Here we are able to affirmatively conclude that under any of the four "taking theories" advanced by the prosecution, the distances involved *do not, as a matter of law,* violate the standards defining "immediate presence" that we adopted for California robbery prosecutions in *Hayes, supra,* 52 Cal.3d 577. (Cf. *Webster, supra,* 54 Cal.3d at pp. 440-441.) In this regard *Green* is distinguishable, and its rule of reversal inapplicable here.

---

[7]Recently, in *People* v. *Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45], we considered the effect of the high court's holding in *Griffin* v. *United States* (1991) 502 U.S. 46 [116 L.Ed.2d 371, 112 S.Ct. 466] on one aspect of *Green*'s rule of reversal not directly implicated here. *Guiton* involved jury instructions that were *legally correct* but not supported by the evidence. Relying on the high court's teachings in *Griffin,* we overruled that portion of our holding in *Green* suggesting a general rule of reversal must also be applied in cases where the jury has been instructed on a *factually unsupportable* theory of the case. In support of that conclusion, we explained that "[t]he jury [is] as well equipped as any court to analyze the evidence and to reach a rationale conclusion. The jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory.' (*Griffin, supra,* 502 U.S. at p. 59 [116 L.Ed.2d at pp. 382-383, 112 S.Ct. at p. 474].)" (*People* v. *Guiton, supra,* 4 Cal.4th at p. 1131.) We made clear in *Guiton* that we were not "decid[ing] the exact standard of review of cases governed by *Green, supra,* 27 Cal.3d 1 [i.e., those involving *legally incorrect* instructional errors]." (*Guiton, supra,* 4 Cal.4th at p. 1130.) We further observed in *Guiton* that *Green*'s rule of reversal, even as applied to legally incorrect instructional errors, "has not been universal," and we acknowledged that "[t]here may be additional ways by which a court can determine that error in the *Green* situation is harmless. We leave the question to future cases." (*Id.* at pp. 1130-1131.)

*The taking of the victim's car keys, car and wallet*

We turn first to the prosecution's theory that defendant was guilty of robbery, either as a direct perpetrator or as an aider and abettor, based on the taking of Atherton's car keys and car, and his wallet and its contents. Defendant was not present when Maple, Valdez F. and Frank P. first accosted Atherton, beat him, obtained his car keys from his person, and forcibly abducted him, taking him in his own car back to Maple's house where defendant waited. Frank P. testified he personally removed the car keys, as well as a "beeper" which operated the Mazda's car alarm, from Atherton's person at the time he was being forcibly subdued. And, although it was not established with certainty who first removed the wallet from Atherton, it was taken from his person at some point between the time Atherton was first abducted, beaten, and placed in his car by the threesome, and the time at which defendant, while seated next to the victim in the Mazda in front of Maple's house, either was handed the wallet by Valdez F. (according to defendant's own testimony) or directly removed the wallet from Atherton's person himself (the prosecution's theory).

At a minimum, the evidence in this case therefore established that the victim's car keys and wallet were removed directly from his person. Significantly, *the defense never claimed otherwise.* Defense counsel's theory of defense to the robbery charge based on the taking of the victim's car keys, car, and wallet was *not* that those items had not been taken from the victim's person or immediate presence, but that defendant was not a direct participant, and thus did not share accomplice liability, at this initial stage of the robbery-abduction. Defense counsel urged in closing argument to the jury: "Clearly [defendant] did not rob Mr. Atherton *personally* of any property." (Italics added.) But counsel freely conceded that "these items were obviously taken by Shon, Valdez and Frank at the time they first abducted Mr. Atherton." He argued that the most reasonable inference to be drawn from the evidence was that Shon Maple took the wallet from the victim's person, stating: "I think the circumstantial evidence is fairly clear that it was Shon who had the best opportunity to *remove* the wallet." (Italics added.)[8]

As we have indicated, the Court of Appeal below expressly concluded that the taking of Atherton's car, and by implication the taking of his wallet and

---

[8]In contrast, the prosecutor urged the jury to conclude the evidence supported an inference that defendant personally removed the wallet from Atherton's person while seated next to him in the Mazda in front of Maple's house, after Maple had blindfolded and handcuffed the victim at defendant's direction. Defendant himself testified that as he sat next to the victim in the vehicle, he removed the cash from the victim's wallet and pocketed it. He testified further on cross-examination that when he obtained the victim's wallet at this point, he *and the others* were all eager to see what it contained. The prosecutor argued to the jury: "The defense says—focuses in on this wallet that was taken from Mr. Atherton. And [defense counsel] says to you that the reasonable interpretation is that Shon Maple is the one who took the wallet. So

its contents, "as a matter of law" satisfied the requirement for robbery that the victim's property forcibly be taken "from his person or immediate presence." (Pen. Code, § 211.) That conclusion was sound.[9] **(3)** For purposes of aider-abettor liability, the commission of a robbery continues so long as the property taken is being carried away to a place of temporary safety. (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1169-1170 [282 Cal.Rptr. 450, 811 P.2d 742].) **(4)** "The act of 'taking' begins when the separation of the victim from his or her property occurs, and it continues through the forcible consummation." (*Webster, supra,* 54 Cal.3d at p. 442.) As the prosecutor argued below, at the time defendant directly and knowingly involved himself in the kidnapping and robbery of Atherton, the victim had not been separated from his property, nor had the property been carried away to a place of temporary safety. Indeed, the commission of the robbery was ongoing *throughout the period during which all four takings were accomplished* because the victim was still being held captive along with his car and other stolen property during that time. (See *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 101 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Fields* (1983) 35 Cal.3d 329, 367 [197 Cal.Rptr. 803, 673 P.2d 680].)

In summary then, the evidence established at a minimum that Maple, Valdez F., and Frank P. forcibly took personal property *from the person of the victim* (car keys, car, wallet) when they first accosted, beat, and abducted him in his own car. These takings as a matter of law satisfied the requirement for robbery that the victim's property be taken *from his person* or immediate presence. The Court of Appeal so found, and nothing presented or argued by the defense at trial undermines this conclusion. Defendant shared aider-abettor liability for the forcible and unlawful takings which constituted

what's Valdez [F.] doing with the wallet? That's the person the defendant said handed him the wallet. Why is there money still in the wallet? If one of those guys took the wallet, the first thing they would have done, just like the defendant, is take the money out of the wallet and put it in their pocket."

[9]In concluding that an element of a charged offense is established "as a matter of law," we do not mean to intimate that when one or more of the requisite elements are overwhelmingly established by the evidence, the jury need not find such elements satisfied in order to convict the defendant of the offense. Contrary to the concurring and dissenting opinion of Justice Kennard, we do not read the high court's pertinent decisions to date as going so far as to suggest that where "the elements of robbery were established by undisputed facts . . . it is of no constitutional significance that . . . the jury may have relied to some extent on the erroneous instruction in reaching its guilty verdict on the robbery charge." (Conc. & dis. opn. of Kennard, J., *post,* at p. 453.)

Rather, in concluding that the takings *directly from Atherton's person* were established "as a matter of law," we are simply determining that the evidence introduced on the taking element—e.g., Frank P.'s testimony that he personally removed the car keys and a car alarm "beeper" from Atherton's pocket during the initial attack, which testimony went uncontroverted by the defense at trial—was plainly sufficient to support the taking requirement and, hence, the jury's robbery verdict.

an ongoing robbery up to and through the point at which he became directly involved in the crime, a matter that was contested at trial but is no longer at issue in our review of the Court of Appeal's judgment.

### The takings from the victim's office and home

The takings of items from Atherton's office and home must be analyzed somewhat differently. The items of property removed from those premises were obviously not taken directly from the victim's "person." Instead, it was the prosecution's theory that they were taken from within Atherton's "immediate presence."

In each instance Atherton was being forcibly restrained in a vehicle parked outside of, first his office complex, then his home, while the premises were looted. During the "office takings," Atherton, blindfolded and handcuffed, was being guarded in his Mazda in the parking lot of the office complex approximately 35 feet from his office building, and 80 feet from a second building which the group subsequently entered and looted. Access to these buildings was gained using keys from the key ring taken earlier from Atherton's person by Frank P. During the subsequent "house takings," Atherton, still blindfolded and handcuffed, was being restrained in the stolen Mercury which was parked "around the corner of the same block" on which his home was located. Once again, access to the home was gained using a key from the key ring removed earlier from the victim's person during the initial forcible abduction. "Two or three suitcases" full of items were removed from Atherton's residence to the vehicles, including firearms, ammunition, leather jackets, and ATM cards from Atherton's safe which defendant retained in his possession.

The circumstance that Atherton was being forcibly detained during the office and home takings, while items of his property were being seized from his home and office premises at the distances from him indicated above, is of particular legal significance to the question of whether these takings were accomplished in his "immediate presence." Under these circumstances, it can be said that but for the use of force, blindfolding, handcuffing, and the ensuing captivity, Atherton's relative proximity to his office building complex (35 to 80 feet) and home ("around the corner of the same block") "would have allowed him to take effective physical steps to retain control of his property, and to prevent defendant and his companions from stealing it." (*Webster, supra*, 54 Cal.3d at p. 440 [victim lured *one-quarter mile away* from his car by robbers who attacked and killed him and then stole his car; "immediate presence" requirement found satisfied].) " '*The trick or device by which the physical presence of the* [*victim*] *was detached from the property*

*under his [possession] and control* should not avail defendant in his claim that the property was not taken from the "immediate presence" of the victim.'" (*Webster, supra,* 54 Cal.3d at p. 441, italics in original, quoting *People v. Lavender* (1934) 137 Cal.App. 582, 591 [31 P.2d 439]; see also *People v. Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908] ["immediate presence" requirement satisfied where victims are put in a walk-in refrigerator while money is taken from a cash register]; *People v. Gordon* (1982) 136 Cal.App.3d 519 [186 Cal.Rptr. 373] ["immediate presence" requirement satisfied where victims are tied up in one room while property is taken from another room].)

■ In this regard, the facts of the present case are fundamentally distinguishable from those we faced in *Hayes, supra,* 52 Cal.3d 577. In *Hayes,* the victim, a motel manager, was murdered in a motel room a distance of 107 feet from his office/living quarters from which property was thereafter stolen. Since the victim was murdered first and then his office/living quarters were looted, the inquiry as to whether the "takings" were from his "immediate presence" was necessarily a limited one. By the defendant's own testimony, the taking activity in which he participated[10] occurred after the killing; the only "overt acts" that could have been perceived by the victim were those associated with the 22 fatal stab wounds inflicted upon him. Given those facts, our primary focus in *Hayes* was on the possibility that the jury, misinstructed under *Miramon-Brown,* might improperly find the immediate presence requirement satisfied by the victim's perception of the force inflicted upon him, thereby rendering the "taking" requirement redundant with the "force or fear" requirement. As for the significance of the 107-foot distance in *Hayes,* we said only that "[u]nder these circumstances, a reasonable finder of fact could conclude either that the property was not so distant as to be beyond the victim's control and protection, or that it was too distant to be in the victim's immediate presence at the time the force was used." (*Hayes, supra,* 52 Cal.3d at p. 629.)

Here, in contrast to *Hayes,* Atherton was alive and being forcibly detained throughout the period during which the office and house takings were accomplished. "[N]othing in *Hayes* suggests that criminals may escape robbery convictions simply by luring their victim far enough away from the property to make his control more difficult or the application of force or fear more convenient." (*Webster, supra,* 54 Cal.3d at p. 441.) Under these facts, defendant cannot be heard to argue, from a legal standpoint, that Atherton

---

[10]Hayes claimed he killed the motel manager in self-defense, and that thereafter another motel resident, James, initiated the plan to remove items of property from the manager's office and living quarters. Hayes asserted he merely assisted James in carrying the loot away. (*Hayes, supra,* 52 Cal.3d at pp. 599-601.)

was too far removed from his office and home, when the takings from those premises were accomplished, to take effective physical steps to retain control of his property and prevent defendant and his companions from stealing it. (*Webster, supra,* 54 Cal.3d at pp. 440-442; *People v. Ramos, supra,* 30 Cal.3d 553; *People v. Lavender, supra,* 137 Cal.App. at p. 591; *People v. Gordon, supra,* 136 Cal.App.3d 519; see also *People v. Prieto* (1993) 15 Cal.App.4th 210, 214 [18 Cal.Rptr.2d 761].) We conclude that, given the facts, the distances involved in the office and home takings ("35 to 80 feet," and "around the corner of the same block") do not, *as a matter of law,* violate the standards defining immediate presence that we adopted for California robbery prosecutions in *Hayes, supra,* 52 Cal.3d 577. (See also *Webster, supra,* 54 Cal.3d at pp. 440-441 [reaching similar conclusion].)

*Was the instructional error prejudicial?*

Thus far we have explained how all four "taking theories" advanced by the prosecution in support of the robbery charge *as a matter of law* did not violate the current standards defining "immediate presence" which we adopted in *Hayes, supra,* 52 Cal.3d 577. We have further explained why, as a result of this conclusion, the Court of Appeal below erred in finding the *Miramon-Brown* instructional error prejudicial under the rule of reversal stated in *Green, supra,* 27 Cal.3d at page 69.[11]

It remains to be determined whether the instructional error in this case was prejudicial under the harmless error test traditionally applied to misinstruction on the elements of an offense, namely, whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *Hayes, supra,* 52 Cal.3d at p. 628 [applying *Chapman* standard to *Miramon-Brown* instructional error]; see *Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d 182, 189, 113 S.Ct. 2078, 2081 ["most constitutional errors have been held amenable to harmless-error analysis, see *Arizona* v. *Fulminante,* 499 U.S. 279, 285, 111 S.Ct. 1246, 1252 [113 L.Ed.2d 302] (1991) (opinion of REHNQUIST, C. J., for the Court) (collecting examples) . . . ."]; *Carella* v. *California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419] (*per curiam*) [harmless error standard applied to instruction containing erroneous conclusive presumption]; *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918] [harmless error standard applied

---

[11]In light of the many decisions of the United States Supreme Court next discussed, which were handed down after *Green* was decided and elaborate on the full nature of the inquiry an appellate court undertakes when conducting *Chapman* harmless error review, the continued validity of *Green's* rule of reversal could be questioned, to the extent it conflicts with the principles announced in those cases.

to instruction misstating an element of the offense]; *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] [harmless error standard applied to instruction containing erroneous burden-shifting presumption]; cf. *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1089 [25 Cal.Rptr.2d 867, 864 P.2d 40] (maj. opn. by Mosk, J.) ["The erroneous omission of the element of intent to kill [from the felony-murder special-circumstance instruction] is not automatically reversible but rather is subject to harmless-error analysis under the 'reasonable doubt' standard for federal constitutional error laid down in [*Chapman*]."]; *People* v. *Odle, supra*, 45 Cal.3d at pp. 414-415.)

Most recently, in *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884] (*Yates*), the United States Supreme Court elaborated on the nature of the inquiry a reviewing court must undertake in applying the *Chapman* harmless-error standard to cases, such as this one, where the jury has been misinstructed on some aspect of an element of the charged offense. We note, parenthetically, that when this court decided *Green, supra*, 27 Cal.3d 1, and *Hayes, supra*, 52 Cal.3d 577, we did not have the benefit of the high court's decision in *Yates*.

*Yates* involved misinstruction on the element of malice in a murder case. The jury was erroneously instructed that the requisite element of malice could be established based on either of two mandatory presumptions: that " 'use of a deadly weapon' " establishes malice, and that the " 'willful, deliberate, and intentional doing of an unlawful act' " operates in the same way. (*Yates, supra*, 500 U.S. at p. 401 [114 L.Ed.2d at p. 441].) Both "mandatory presumptions" were unconstitutional, as conceded by respondents in *Yates*. (*Id.* at pp. 401-402 [114 L.Ed.2d at pp. 441-442].)

Although the present case does not involve misinstruction of the jury with a mandatory presumption, the high court's discussion of *Chapman* harmless error review in *Yates* is nonetheless instructive on the prejudice analysis that must be undertaken here.[12] The following quoted passage from *Yates* sheds light on the analysis to be performed in assessing the prejudicial impact under *Chapman* of instructional error on the elements of an offense:

"To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial

---

[12]In at least one prior case we have invoked the rationale of *Yates* to find instructional error analogous to misinstruction on the elements of an offense harmless beyond a reasonable doubt. (See *People* v. *Johnson* (1993) 6 Cal.4th 1, 46 [23 Cal.Rptr.2d 593, 859 P.2d 673] [failure to instruct on the necessary intent-to-kill element of the felony-murder special circumstance in a "window period" case involving a felony murder committed between the filing of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Anderson* (1987) 43 Cal.3d 1104 (240 Cal.Rptr. 585, 742 P.2d 1306)].)

later held to have been erroneous. When, for example, a trial court has instructed a jury to apply an unconstitutional presumption, a reviewing court can hardly infer that the jurors failed to consider it, a conclusion that would be factually untenable in most cases, and would run counter to a sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given. See *Richardson v. Marsh*, 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702] (1987) ('The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant').

"To say that an error did not contribute to the verdict is, rather, to find that error unimportant *in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that an instruction to apply an unconstitutional presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.*

"Before reaching such a judgment, a court must take two quite distinct steps. First, it must ask what evidence the jury actually considered in reaching its verdict. If, for example, the fact presumed is necessary to support the verdict, a reviewing court must ask what evidence the jury considered as tending to prove or disprove that fact. [Fn. omitted.] Did the jury look at only the predicate facts, or did it consider other evidence bearing on the fact subject to the presumption? In answering this question, a court does not conduct a subjective enquiry into the jurors' minds. The answer must come, instead, from analysis of the instructions given to the jurors and from application of that customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so.

"Once a court has made the first enquiry into the evidence considered by the jury, it must then weigh the probative force of that evidence as against the probative force of the presumption standing alone. To satisfy *Chapman*'s reasonable doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. *Since that enquiry cannot be a subjective one into the jurors' minds, a court must approach it by asking whether the force of the evidence presumably considered by the jury in*

*accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption.*" (*Yates, supra,* 500 U.S. at pp. 403-405 [114 L.Ed.2d at pp. 448-449], italics added.)

 With these fundamental principles of *Chapman* review firmly in mind, the error in the rationale of Justice Mosk's concurring and dissenting opinion becomes apparent. That opinion misplaces principal reliance on the high court's recent decision in *Sullivan* v. *Louisiana, supra,* 508 U.S. __ [124 L.Ed.2d 182, 113 S.Ct. 2078] (*Sullivan*). The specific holding of *Sullivan* is that the giving of a constitutionally deficient *reasonable doubt instruction* can never be deemed harmless under a *Chapman* analysis. (*Sullivan, supra,* 508 U.S. at p. __ [124 L.Ed.2d at pp. 187-192, 113 S.Ct. at pp. 2080-2083].) In reaching this conclusion, Justice Scalia, writing for the court, did have occasion to first reiterate the time-honored *Chapman* standard, and then briefly paraphrase the court's earlier holding in *Yates, supra,* 500 U.S. 391, in a manner fully consistent with our own reading of that decision. (*Sullivan, supra,* 508 U.S. at p. __ [124 L.Ed.2d at pp. 189-190, 113 S.Ct. at p. 2081].) *Sullivan* goes on to explain the "illogic" of applying such harmless error review to a case in which the jury has been given a *constitutionally deficient reasonable doubt instruction.* (*Sullivan, supra,* 508 U.S. at p. __ [124 L.Ed.2d at pp. 189-190, 113 S.Ct. at p. 2082].) That is so because, in such a case, "there has been no jury verdict within the meaning of the Sixth Amendment" of "guilty-beyond-a-reasonable-doubt," and for that reason "the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless." (*Ibid.,* italics in original.)

The *Sullivan* court observed that: "In [*Arizona* v.] *Fulminante* [*supra,* 113 L.Ed.2d 302, 111 S.Ct. 1246,] we distinguished between, on the one hand, 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards,' and, on the other hand, trial errors which occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.' *Fulminante, supra,* 499 U.S. 279, 113 L.Ed.2d 302, 111 S.Ct. 1246. Denial of the right to a jury verdict of guilt beyond a reasonable doubt [as the result of a *constitutionally deficient reasonable doubt instruction*] is certainly an error of the former sort, the jury guarantee being a 'basic protectio[n]' whose precise effects are unmeasureable, but without which a criminal trial cannot reliably serve its function. [Citation.] . . . The deprivation of that right [to trial by jury], with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" (*Sullivan, supra,* 508 U.S. at pp. __ [124 L.Ed.2d at pp. 190-191, 113 S.Ct. at pp. 2082-2083].)

There was no constitutionally defective reasonable doubt instruction given in the present case. The precise holding in *Sullivan* thus has no direct bearing on the question at hand; did the *Miramon-Brown* misinstruction on "immediate presence" prejudice the robbery and robbery-related verdicts under the *Chapman* test? As Chief Justice Rehnquist observed in his separate concurring opinion characterizing the holding in *Sullivan*: "I accept the Court's conclusion that a constitutionally deficient reasonable-doubt instruction is a breed apart from the many other instructional errors that we have held *are* amenable to harmless-error analysis." (*Sullivan, supra*, 508 U.S. at p. __ [124 L.Ed.2d at p. 193, 113 S.Ct. at p. 2084], italics in original (conc. opn. of Rehnquist, C. J.) [citing, among other examples of instructional errors which *are* subject to harmless error review, "instruction[s] misstating an element of the offense," with citation to *Pope* v. *Illinois, supra*, 481 U.S. 497].) The error under review in *Sullivan* is a "breed apart" from the *Miramon-Brown* instructional error we face in this case. For this reason, Justice Mosk's apparent fear that our opinion in this case is inconsistent with, and unfaithful to, the high court's opinion in *Sullivan*, is simply unfounded.

Justice Mosk's understanding of the analysis an appellate court must undertake in conducting *Chapman* review of misinstruction on an element of an offense is also at odds with the holding in *Yates*. His concurring and dissenting opinion suggests that "to say that the superior court's instructional misdefinition of the 'immediate presence' element of the crime of robbery did not contribute to the verdict is to make a judgment about the significance of the instructional misdefinition to reasonable jurors, when considered against the other pertinent, and proper, instructions." (Conc. & dis. opn. of Mosk, J., *post*, at p. 443.) But that is only part of our inquiry under the mandate of *Chapman* and *Yates*; we must ultimately look to the *evidence* considered by defendant's jury under the instructions given in assessing the prejudicial impact or harmless nature of the error. Justice Mosk appears to conclude otherwise, implying that we should virtually ignore the record evidence as largely irrelevant to our task, and expressly concluding that any finding as to whether the jury "actually rendered its actual verdict" without reliance on the *Miramon-Brown* misinstruction must turn on "whether the other pertinent and proper instructions are so implicated on the record, including the parties' evidence and theories, as to compel a conclusion beyond a reasonable doubt that they must have made the instructional misdefinition superfluous." (*Id.* at pp. 443-444.) This conclusion—that "[i]t is only if the instructional misdefinition [is] minimal in importance compared to the other pertinent and proper instructions that it can be held not to have contributed to the verdict" (*id.* at p. 444)—does not accurately characterize the prejudice analysis to be undertaken here. As explained in *Yates*,

under *Chapman* we must inquire whether it can be determined, beyond a reasonable doubt, that the jury actually rested its verdict on *evidence* establishing the requisite "taking" element of robbery independently of the force of the *Miramon-Brown* misinstruction. (*Yates, supra,* 500 U.S. at p. 405 [114 L.Ed.2d at p. 449.)[13]

As previously noted, *Yates* involved misinstruction in a murder case on the requisite element of malice, the trial court having erroneously told the jury the element could be established based on either of two mandatory presumptions, both of which in fact were unconstitutional. The Supreme Court's task in *Yates,* therefore, was to determine the effect of the erroneous mandatory presumptions on the jury's verdict impliedly finding malice. First, the court determined that in light of all the instructions the jury would have considered all the evidence relevant to malice. (*Yates, supra,* 500 U.S. at pp. 408-409 [114 L.Ed.2d at p. 452].) Then, looking itself to all the relevant evidence, the court concluded the evidentiary record did not clearly establish malice; hence the court was unable to infer beyond a reasonable doubt that the mandatory presumptions did not contribute to the jury's verdict. (*Id.* at pp. 409-410 [114 L.Ed.2d at p. 452].)

Here, by contrast, the trial court's misinstruction did not implicate the entirety of the definition of the "taking" element of robbery—instead the jury was misinstructed on one of two possible factual *theories* by which that element could be satisfied, i.e., the theory of a taking from the victim's immediate presence. No instructional error occurred in connection with the alternate theory by which the element of taking could be satisfied—the theory of a taking directly from the victim's person.

With this distinction in mind, we turn again to the language in *Yates* that must guide this court: "To say that an error did not 'contribute' to the

[13]The concurring and dissenting opinion of Justice Mosk errs in several other particulars. For example, it is stated that: "Manifestly, the People's theory [of robbery] required resort to the instructional misdefinition of the 'immediate presence' element. It sought to reach every taking of every item by either defendant himself or any of his partners. It could do so only because 'immediate presence' was misdefined as the area within which the victim could perceive, by some sense, some 'overt act' connected with the offense—including the area within which he could hear defendant and/or any of his partners speak about the matter." (Conc. & dis. opn.of Mosk, J., *post,* at p. 445.) If what is meant by this passage is that the prosecution, in order to prove commission of a robbery under the posture of the case as it was presented to the jury, was required to establish *four valid takings* under each of the "taking" theories noted, then the dissent is revisiting the unanimity instruction issue and redeciding it in defendant's favor. As the Court of Appeal below aptly recognized, that issue is not directly before us in this appeal. On remand, it can be considered in conjunction with other issues that were not reached in light of the reversal for *Miramon-Brown* instructional error. (See *post,* at p. 431, fn. 14.)

verdict," the high court stated, is not to say "the jury was totally unaware of that feature of the trial later held to have been erroneous." (*Yates, supra,* 500 U.S. at p. 403 [114 L.Ed.2d at pp. 448-449].) Here, of course, the jury certainly was aware of the evidence and arguments of counsel concerning those takings that would not have been from Atherton's person, but only from his immediate presence. "To say that an error did not contribute to the verdict," the court continued, "is, rather, to find that error unimportant in relation to everything else the jury considered *on the issue in question,* as revealed in the record." (*Ibid.,* italics added.)

In *Yates,* as indicated, the "issue in question" was malice. Here, the issue in question is not whether the takings were from Atherton's immediate presence; rather, the issue in question is simply whether there was a taking— *either* from Atherton's person *or* from his immediate presence—sufficient to satisfy the taking requirement for robbery. Paraphrasing *Yates,* "to say that an instruction [here, misdefining the facts necessary to support *one theory* establishing an element] did not contribute to the verdict is to make a judgment about the significance of the [instruction] to reasonable jurors, when measured against the other evidence considered by those jurors independently of the [evidence to which the erroneous instruction applied]." (*Yates, supra,* 500 U.S. at p. 404 [114 L.Ed.2d at pp. 449-450].) Continuing, the high court stated, "If, for example, the fact presumed [or, as here, the factual theory concerning which the jury was misinstructed] is necessary to support the verdict, a reviewing court must ask what evidence the jury considered as tending to prove or disprove that fact." (*Id.* at p. 404 [114 L.Ed.2d at pp. 449-450], fn. omitted.) Then, in a footnote at this point, the court admonished: "If the presumed fact is not itself necessary for the verdict, but only one of a variety of facts sufficient to prove a necessary element, the reviewing court should identify not only the evidence considered for the fact subject to the presumption, but also the evidence for alternative facts sufficient to prove the element." (500 U.S. at p. 404, fn. 9 [114 L.Ed.2d at p. 449].)

The latter caveat, in our view, is relevant here, as it was not in *Yates.* Here the theory on which the jury was misinstructed is "not itself necessary for the verdict"; rather, the theory of a taking from Atherton's immediate presence is "only one of a variety of facts sufficient to prove" the necessary element of taking.

The trial court instructed the jurors on both theories of taking. In particular, the jury was told that "[r]obbery is the felonious taking of personal property in the possession of another, *from his person* or immediate presence, and against his will, accomplished by means of force or fear." (Italics

added; see CALJIC No. 9.40.) We are directed in *Yates* to apply the "customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so." (*Yates, supra,* 500 U.S. at p. 404 [114 L.Ed.2d at p. 449].) The court's instructions made the question whether there was a taking from the victim's person a "point in issue" for the jury. Following *Yates,* we therefore presume the jury considered all relevant evidence relating to a taking from the victim's person.

The United States Supreme Court has admonished that, "[h]armless-error analysis addresses . . . what is to be done about a trial error that, in theory, may have altered the basis on which the jury decided the case, *but in practice clearly had no effect on the outcome.*" (*Rose* v. *Clark, supra,* 478 U.S. at p. 582, fn. 11 [92 L.Ed.2d at p. 473], italics added.) Because the force of the evidence showing Atherton's wallet, car keys, and automobile *were taken directly from his person* is "overwhelming" (see *Yates, supra,* 500 U.S. at p. 405 [114 L.Ed.2d at pp. 449-450]), the conclusion is inescapable that the evidence, as *Yates* requires, is "of such compelling force as to show beyond a reasonable doubt" that the erroneous instruction "must have made no difference in reaching the verdict obtained." (*Yates, supra,* 500 U.S. at p. 407 [114 L.Ed.2d at pp. 451-452].)[14]

---

[14]It must be borne in mind that in order for the jury to return a guilty verdict on the single count of robbery charged, it was only required to unanimously agree beyond a reasonable doubt that the evidence established *a taking* sufficient to support a finding that *a robbery* had been committed. This is *not* a case in which multiple convictions of robbery were being sought for each of the prosecution's "taking theories." Defendant did not prevail on his request for a unanimity instruction directed to the single robbery count. Because the Court of Appeal reversed the robbery and robbery-related verdicts under *Green, supra,* 27 Cal.3d 1, that court found it unnecessary to resolve defendant's remaining claims on appeal, including the claim that the trial court erred in refusing the instruction.

For purposes of guidance on remand, we observe that "[t]he unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction." (*People* v. *Stankewitz, supra,* 51 Cal.3d 72, 100.) Even assuming a defendant, by and through the argument of counsel to the jury, suggests differing defenses to each of the alleged acts, still it must be determined whether there is any "reasonable basis" for the jury to distinguish between them in determining whether the "continuous conduct" rule applies. (*Ibid.*)

Here, there was an ongoing forcible restraint of the victim throughout his two-day ordeal up until his murder. In particular, he was being held captive along with his stolen car throughout the period during which the office and home takings were accomplished. (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 101.) The takings were successive and compounding in nature; none of the items of personal property taken from Atherton's home and office were "carried away to a place of temporary safety" until well after completion of the looting of those premises. (*People* v. *Cooper, supra,* 53 Cal.3d at pp. 1169-1170.) We may therefore question whether *any* "reasonable basis" was available to *legally* distinguish between the four "taking theories" for purposes of establishing the single count of robbery charged. The successive takings arguably reflected a "continuing course of conduct," the central objective of which

## IV

That portion of the judgment of the Court of Appeal reversing the robbery, kidnapping for robbery, and first degree murder convictions is reversed. In all other respects the judgment is affirmed, and the matter remanded to the Court of Appeal for further proceedings consistent with this opinion.

Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it affirms the judgment of the Court of Appeal affirming the judgment of the superior court convicting defendant of numerous crimes.

I dissent, however, from the judgment insofar as it reverses the judgment of the Court of Appeal reversing the judgment of the superior court convicting defendant of the crimes of murder in the first degree, robbery in the second degree, and kidnapping for robbery. As I shall explain, the robbery conviction must be reversed because the superior court erred under both California law and the United States Constitution by misdefining the element of "immediate presence" in its instructions to the jury. With robbery fall murder and kidnapping for robbery, which are related thereto, the former through the doctrine of felony murder. My colleagues recognize the error on robbery. But they refuse to acknowledge its reversibility. As for the federal Constitution, they strive hard to avoid such decisions of the United States Supreme Court as *Sullivan* v. *Louisiana* (1993) 508 U.S. __ [124 L.Ed.2d 182, 113 S.Ct. 2078] (hereafter sometimes *Sullivan*), *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884] (hereafter sometimes *Yates*), and *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (hereafter sometimes *Chapman*). As for state law, they all but ignore our recent decision in *People* v. *Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45] (hereafter sometimes *Guiton*). By doing so, they commit error in this case and threaten needless mischief in those that follow. In this, I cannot and will not join.

## I

In its charge, the superior court instructed the jury that the People had to prove all the elements of a crime beyond a reasonable doubt before they were entitled to a verdict of guilty.

was to rob Atherton of all of his property wherever it might be located, while forcibly restraining him in his own vehicle and transporting him to the various locations for the purpose of assisting the group in that objective. Indeed, the prosecutor indicated on the record, at the time the trial court rejected the requested unanimity instruction, that only one count of robbery had been charged in this case largely in anticipation that multiple punishments would be unattainable under the proscriptions of Penal Code section 654.

As to the crime of robbery, of which defendant stood accused, the superior court instructed as follows:

"Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear with the specific intent permanently to deprive such person of such property is guilty of the crime of robbery in violation of Penal Code section 211.

"In order to prove such crime, each of the following elements must be proved:

"One, the person had possession of property of some value, however slight;

"Two, such property was taken from such person or from his immediate presence;

"Three, such property was taken against the will of such person;

"Four, the taking was accomplished either by force, violence, fear or intimidation;

"And, five, such property was taken with the specific intent to permanently deprive such person of the property."

In conformity with decisions including *People* v. *Brown* (1989) 212 Cal.App.3d 1409, 1419 [261 Cal.Rptr. 262] (hereafter *Brown*), and *People* v. *Miramon* (1983) 140 Cal.App.3d 118, 124 [189 Cal.Rptr. 432] (hereafter *Miramon*), the superior court defined the "immediate presence" element as follows:

"The act of robbery is deemed to have occurred within the immediate presence of a victim so long as the victim perceived any overt act connected with the commission of the offense. Any and all of the sensory perceptions of the victim are to be considered in determining presence."

Supporting these instructions, the evidence adduced at trial revealed that defendant could possibly be found guilty of robbery, as either a direct perpetrator or an aider and abetter, with regard to the taking of four items or groups of items of personal property belonging to the victim: (1) the victim's automobile and/or its contents; (2) the victim's wallet and/or its contents; (3) certain of the victim's possessions at his office; and/or (4) certain of the victim's possessions at his residence.

The theory presented at trial by the People was that defendant was guilty of robbery, without specification, as either a direct perpetrator or an aider and abettor on the basis of any or all of the takings of any or all of the items. As to the "immediate presence" element, the theory embraced "immediate presence" as the area within which the victim could perceive, by some sense, some "overt act" connected with the offense. The reason was evidently this: although some of the takings of some of the items might satisfy the "immediate presence" element as from the victim's "person," most—as the prosecutor himself conceded—could do so only as from the victim's "immediate presence" as defined above. All the takings of all the items had at least been spoken of by defendant and/or one or more of his partners within the victim's hearing.

In accordance with this theory, the prosecutor argued as to the taking of the victim's possessions at his office: "What about the items that were taken from the business? *They weren't taken from [the victim's] person. They weren't taken from his immediate presence.* He wasn't in actual possession, but he had constructive possession of those items of property. Taken from his immediate presence *because he was able to perceive several overt acts associated with the taking of that property.* When he was sitting out in front of [the] house [of one of defendant's partners], clearly he must have heard them talking about going back to the business. On the way to the business, [another one of defendant's partners] was asking him questions. Once at the business, there was a point in time when [the former of the partners]—and . . . this is before any property is taken—specifically asked [the victim] about the building that he had come out of. [¶] I suggest to you, ladies and gentlemen, that these overt acts associated with the commission of the taking of that property made the taking of that property within [the victim's] immediate presence as defined by the law, even though [the victim] was out in the car at the time the items were taken." (Italics added.)

The prosecutor argued similarly as to the taking of the victim's possessions at his residence: "We [are] about to discuss the application of the law of robbery to the taking of the items that were—from [the victim's] house. [¶] And we [are] doing that in the context of the rule requiring that the items be taken from his immediate presence. Again, immediate presence means where an act of robbery is committed within a person's immediate presence *when as long as the victim perceives an overt act associated with the connection [sic: commission] of the offense.* [¶] So again the focus is on the overt acts. What overt acts do we have with respect to the taking of property from [the victim's] house? Well, at the business they questioned [him] about the location of his home. They questioned him about property that he had at his house. [¶] He knew he was being taken to his house and he was in fact

forced to give directions on the way over to the house. . . . [¶] While at his house, or parked around the corner from his house about five houses away, [one of defendant's partners] comes back and demands information from him concerning property that he knows to be in his house. [¶] These overt acts make the taking of the property from [the victim's] house a robbery." (Italics added.)

After deliberations, the jury rendered a verdict finding defendant guilty of robbery and, at the superior court's direction, fixing the degree at the second.

## II

### A

In delivering its instructional definition of the "immediate presence" element of the crime of robbery, the superior court erred under California law.

In *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376] (hereafter sometimes *Hayes*), we held that the proper definition of "immediate presence" within the meaning of Penal Code section 211 was that which was "generally accepted" among courts and commentators as to similar provisions, to wit: " ' "[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." ' " (*Id.* at pp. 626-627.) We then effectively defined "immediate presence" simply as "an area over which the victim, at the time force or fear was employed, could be said to exercise some physical control." (*Id.* at p. 627.) We disapproved decisions including *Brown* and *Miramon* to the extent that they were inconsistent.

In *Hayes*, we proceeded to review an instructional definition of the "immediate presence" element that was, in pertinent part, as follows: " 'An act of robbery can be said to have occurred in the victim's immediate presence as long as the victim perceived any overt act connected with the commission of the offense.' " (*People* v. *Hayes, supra,* 52 Cal.3d at pp. 627-628.) We found this definition erroneous. It effectively expanded the scope of the "immediate presence" element, by causing it to reach facts not properly within its ambit. It "permitted the jury to find the 'immediate presence' element of robbery if any of the acts mentioned in the general definition of robbery occurred in the victim's presence." (*Id.* at p. 628.) It "thus rendered the 'immediate presence' element devoid of all independent meaning, making it redundant with" any and all other elements with "overt

acts" within the area of the victim's perception. (*Ibid.*) "For example, a person might enter the victim's home and there, by the use of force or fear, compel the victim to reveal the combination of a safe located many miles away in the victim's office. The culprit at the victim's house could then relay the combination to a confederate waiting in or near the office, who could use it to open the safe and take its contents before the victim could reach the office or otherwise interfere with the taking. In such a case, the criminals would . . . not have taken property from the . . . immediate presence of the victim" under a proper definition of the element. (*Id.* at p. 627.) But they would have done so under the misdefinition set out above, which would be satisfied by the fact that such an "overt act" as the first criminal's use of force or fear was within the area of the victim's perception.

It follows from the foregoing that the superior court's instructional definition of the "immediate presence" element, which was substantially similar to that found erroneous in *Hayes*, was itself erroneous. Like its counterpart in *Hayes*, it effectively expanded the scope of the element.

### B

Insofar as the superior court's instructional misdefinition of the "immediate presence" element of the crime of robbery was erroneous under California law, it requires reversal on that basis.

The error here is apparently not reversible per se but instead subject to harmless error analysis under *Guiton*.

In *Guiton*, we addressed the broad question, what is the standard for prejudice when the jury is presented with alternate theories of conviction, one (or more) of which is erroneous and one (or more) of which is not?

In arriving at an answer, we considered, and "harmonized" (*People* v. *Guiton, supra*, 4 Cal.4th at p. 1121), our earlier decision in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (hereafter *Green*) and the United States Supreme Court's later decision in *Griffin* v. *United States* (1991) 502 U.S. 46 [116 L.Ed.2d 371, 112 S.Ct. 466] (hereafter *Griffin*).

Under the *Griffin* rule, as "properly construed" in *Guiton* (*People* v. *Guiton, supra*, 4 Cal.4th at p. 1121), when a *factually* erroneous theory of conviction is presented to the jury—i.e., when the theory, though consistent with the law, is not supported by the evidence—reversal is *not* required unless, on the record made at trial, the reviewing court determines that the conviction actually, and solely, rests on the factually erroneous theory (*id.* at pp. 1126-1131).

By contrast, under the *Green* rule, as "properly construed" in *Guiton* (*People* v. *Guiton, supra,* 4 Cal.4th at p. 1121), when a *legally* erroneous theory of conviction is presented to the jury—i.e., when the theory, though supported by the evidence, is not consistent with the law *or* when the theory, though consistent with the law, is not supported by legally sufficient evidence—reversal *is* required unless, on the record made at trial, the reviewing court can determine that the conviction actually, if not solely, rests on a legally proper theory (*id.* at pp. 1126-1131).

The error here amounts to the presentation to the jury of a *legally* erroneous theory of conviction *in the sense of a theory that was not consistent with the law.* As explained, the instruction in question misdefined the "immediate presence" element of robbery.

Reversal is required because, on the record made at trial, we cannot determine that defendant's conviction actually, if not solely, rests on a legally proper theory. There is simply nothing in the evidence or the arguments or the instructions that establishes or even suggests that the verdict is based on the "immediate presence" element properly defined. Indeed, what there *is* clearly indicates that the verdict depends on the misdefinition. More on that in due course. (See pp. 444-445, *post.*)

### C

Both the majority and Justice Kennard in her concurring and dissenting opinion agree that the superior court's instructional misdefinition of the "immediate presence" element of the crime of robbery was erroneous under California law.

Justice Kennard does not go on to consider the question of reversibility on that basis.

The majority do, and answer in the negative. They are wrong. They all but ignore *Guiton,* relegating it to a passing footnote. More significant, they altogether ignore the *Green* rule, as "properly construed" in *Guiton.* (*People* v. *Guiton, supra,* 4 Cal.4th at p. 1121.) Instead, they take a tortuous detour through *Green's* peculiar facts to conclude that its reasoning does not require reversal. In so doing, they merely set up and knock down a straw man. That is to say, they proceed as though the jury here had been presented with a legally erroneous theory of conviction *in the sense of a theory that was not supported by legally sufficient evidence.* That is simply not the case. As explained, the jury was presented with a legally erroneous theory of conviction *in the sense of a theory that was not consistent with the law.*

## III

### A

In delivering its instructional definition of the "immediate presence" element of the crime of robbery, the superior court erred under the United States Constitution as well as California law. *Hayes* compels the result. (See *People* v. *Hayes*, *supra*, 52 Cal.3d at pp. 628-629.)

The due process clause of the Fourteenth Amendment to the United States Constitution requires that, before it may obtain a valid conviction, the state must prove every element of a crime, and must do so beyond a reasonable doubt. (E.g., *Sullivan* v. *Louisiana*, *supra*, 508 U.S. at pp. ___-___, ___ [124 L.Ed.2d at pp. 187-188, 189-190, 113 S.Ct. at pp. 2080-2081, 2082].)

It follows that jury instructions in a state criminal trial omitting the requirement of proof of every element of a crime *beyond a reasonable doubt* are erroneous under the Fourteenth Amendment's due process clause. (See *Jackson* v. *Virginia* (1979) 443 U.S. 307, 320, fn. 14 [61 L.Ed.2d 560, 574, 99 S.Ct. 2781].)

Evidently, similar instructions merely misdefining the beyond-a-reasonable-doubt standard by effectively lowering its threshold are also erroneous under the Fourteenth Amendment's due process clause. (*Sullivan* v. *Louisiana*, *supra*, 508 U.S. at pp. ___-___ [124 L.Ed.2d at pp. 187-188, 113 S.Ct. at pp. 2080-2081].)

"The Sixth Amendment," *Sullivan* explains, "provides that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . .' . . . [W]e [have] found this right to trial by jury in serious criminal cases to be 'fundamental to the American scheme of justice,' and therefore applicable in state proceedings. The right includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' [Citation.] Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence. [Citations.]

"What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements, [citations]. This beyond-a-reasonable-doubt requirement, which was adhered to by virtually all common-law jurisdictions, applies in state as well as federal proceedings. [Citation.]

"It is self-evident, we think, that the [Fourteenth] Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine . . . whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt. . . . [A]n instruction [misdefining proof beyond a reasonable doubt by effectively lowering its threshold] . . . does not produce such a verdict." (*Sullivan* v. *Louisiana, supra*, 508 U.S. at pp. \_\_-\_\_ [124 L.Ed.2d at pp. 187-188, 113 S.Ct. at pp. 2080-2081], italics in original, fn. omitted.)

Likewise, jury instructions in a state criminal trial omitting the require-ment of proof beyond a reasonable doubt of *every element of a crime* are erroneous under the Fourteenth Amendment's due process clause. (*Rael* v. *Sullivan* (10th Cir. 1990) 918 F.2d 874, 875; *Cole* v. *Young* (7th Cir. 1987) 817 F.2d 412, 423-426; cf. *U.S.* v. *Gaudin* (9th Cir. 1994) 28 F.3d 943, 945-947 (in bank) [holding that jury instructions in a federal criminal trial omitting the requirement of proof beyond a reasonable doubt of every element of a crime are erroneous under the Fifth Amendment's due process clause].)

Under the reasoning of *Sullivan*, similar instructions merely misdefining an element of a crime by effectively expanding its scope are also erroneous under the due process clause of the Fourteenth Amendment. As stated, the Sixth Amendment right to trial by jury includes, as its core, the right to have the jury, rather than the judge, reach the requisite finding of "guilty." To reach that finding, the jury must determine, under the demand of the due process clause, that the state has proved every element of the crime charged, and has done so beyond a reasonable doubt. The Fourteenth Amendment requirement of proof beyond a reasonable doubt of every element of the crime charged and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is guilty beyond a reasonable doubt of the crime charged under a misdefinition of one or more of its elements, and then leave it up to the judge to determine whether he is guilty beyond a reason-able doubt of the crime charged under a proper definition of all its elements. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt of the crime charged under a proper definition of all its elements. An instruction misdefining any element by effectively expanding its scope does not produce such a verdict.

It follows from the foregoing that the superior court's instructional mis-definition of the "immediate presence" element, which effectively expanded

its scope, was erroneous under the Fourteenth Amendment's due process clause.

### B

The fact of error raises the question of reversibility.

Insofar as the superior court's instructional misdefinition of the "immediate presence" element of the crime of robbery was erroneous under the United States Constitution, it is apparently not reversible per se but instead subject to harmless error analysis under *Chapman*. (See *People* v. *Hayes*, *supra*, 52 Cal.3d at pp. 628-629.)

"The *Chapman* test," as explained in *Yates* and *Sullivan*, "is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*Yates* v. *Evatt*, *supra*, 500 U.S. at pp. 402-403 [114 L.Ed.2d at pp. 441-442], quoting *Chapman* v. *California*, *supra*, 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]; accord, *Sullivan* v. *Louisiana*, *supra*, 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-189, 113 S.Ct. at pp. 2081-2082].) "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates* v. *Evatt*, *supra*, 500 U.S. at p. 403 [114 L.Ed.2d at p. 449]; accord, *Sullivan* v. *Louisiana*, *supra*, 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-189, 113 S.Ct. at pp. 2081-2082].)

Thus, the focus under *Chapman* is what the jury actually decided and whether the error may have tainted its decision. "[T]he issue . . . is whether the jury actually rested its verdict on" an adequate basis, "independently of the" error. (*Yates* v. *Evatt*, *supra*, 500 U.S. at p. 404 [114 L.Ed.2d at p. 449].) Stated differently, whether the error had any "effect" "upon the . . . verdict in the case at hand." (*Sullivan* v. *Louisiana*, *supra*, 508 U.S. at p. __ [124 L.Ed.2d at pp. 188-189, 113 S.Ct. at p. 2081].) Or in still other words, "whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error." (*Ibid.*, italics in original.)

As a consequence, the focus under *Chapman* is *not* what a reviewing court might itself decide if it looked to the entire record.

First, a reviewing court is not the proper decision-maker. (*Sullivan* v. *Louisiana*, *supra*, 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. at pp. 2081-2082].) To be sure, *Rose* v. *Clark* (1986) 478 U.S. 570, 579 [92 L.Ed.2d 460, 471, 106 S.Ct. 3101] (hereafter sometimes *Clark*) states that an error is harmless "[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt . . . ." Moreover, *Pope* v. *Illinois* (1987) 481 U.S. 497, 502-503 [95 L.Ed.2d 439,

446-447, 107 S.Ct. 1918] (hereafter sometimes *Pope*), quotes that language (albeit inaccurately) with approval. Questions about the soundness of *Clark* and *Pope* in this regard were raised by the analysis in Justice Scalia's concurring opinion in *Carella* v. *California* (1989) 491 U.S. 263, 267-273 [105 L.Ed.2d 218, 222-223, 109 S.Ct. 2419] (hereafter sometimes *Carella*). They were soon resolved. *Yates* expressly declares that the *Clark* statement is simply "not . . . correct." (*Yates* v. *Evatt, supra*, 500 U.S. at pp. 402-403, fn. 8 [114 L.Ed.2d at p. 449].) And *Sullivan* impliedly disapproves *Pope*'s approval of that language, relying as it does on Justice Stevens's dissenting opinion in *Pope*: "The harmless-error doctrine may enable a court to remove a taint from proceedings in order to *preserve* a jury's findings, but it cannot constitutionally *supplant* those findings." (*Pope* v. *Illinois, supra*, 481 U.S. 497, 509 [95 L.Ed.2d at p. 451] (dis. opn. of Stevens, J.) italics in original, cited in *Sullivan* v. *Louisiana, supra*, 508 U.S. at p. __ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. 439, 2082].) By its very terms, of course, *Chapman* precludes a reviewing court from finding harmlessness based simply "upon [its own] view of 'overwhelming evidence.' " (*Chapman* v. *California, supra*, 386 U.S. at p. 23 [17 L.Ed.2d at pp. 710-711].)

Second, a reviewing court is not automatically entitled to consider the entire record. The broad "assumption" in decisions like *Clark* that the "harmlessness of an error is to be judged after a review of the entire record" is unsound—unless, that is, "the jurors, as reasonable persons, would have considered the entire . . . record" in spite of the error. (*Yates* v. *Evatt, supra*, 500 U.S. at pp. 405-406 [114 L.Ed.2d at p. 450].)

Neither is the focus under *Chapman* what a reviewing court might conjecture the jury would have decided in the absence of the error. The "hypothetical inquiry" whether, if the jury had not been exposed to the error, it would have made the decision it did, "is inconsistent with the harmless-error standard announced in *Chapman* . . . . While such a hypothetical inquiry ensures that the state has, in fact, proved [the element in question] beyond a reasonable doubt, it does not ensure that it has proved that element beyond a reasonable doubt *to the satisfaction of a jury*." (*Yates* v. *Evatt, supra*, 500 U.S. 391, 414 [114 L.Ed.2d at p. 455] (conc. opn. of Scalia, J.), italics in original; accord, *Sullivan* v. *Louisiana, supra*, 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 189-190, 113 S.Ct. at pp. 2081-2082].) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered . . . ." (*Sullivan* v. *Louisiana, supra*, 508 U.S. at p. __ [124 L.Ed.2d at p. 189, 113 S.Ct. at p. 2081].) *Sullivan* relies, in part, on Justice Stevens's dissenting opinion in *Pope*: "It is fundamental that an appellate court (and for that matter, a trial court) is not free to decide in a criminal case that, if asked, a jury *would* have found

something that it did not find." (*Pope* v. *Illinois, supra,* 481 U.S. 497, 509-510 [95 L.Ed.2d at p. 451], italics in original (dis. opn. of Stevens, J.), cited in *Sullivan* v. *Louisiana, supra,* 508 U.S. at p. __ [124 L.Ed.2d at pp. 189-190, 113 S.Ct. at p. 2082].)

Lastly, the focus under *Chapman* is not what a reviewing court might speculate concerning "what effect the . . . error might generally be expected to have upon a reasonable jury . . . ." (*Sullivan* v. *Louisiana, supra,* 508 U.S. at p. __ [124 L.Ed.2d at p. 189, 113 S.Ct. at p. 2081].) Thus, *Pope*'s concern with what a "rational juror" might or might not find is beside the point. (*Pope* v. *Illinois, supra,* 481 U.S. at p. 503 [95 L.Ed.2d at pp. 446-447].) "[M]ore than appellate speculation about a hypothetical jury's action" is required. (*Sullivan* v. *Louisiana, supra,* 508 U.S. at p. __ [124 L.Ed.2d at p. 190, 113 S.Ct. at p. 2082].)

In determining whether the superior court's instructional misdefinition of the "immediate presence" element was harmless under *Chapman,* we must commence our analysis with the declaration of *Yates* in mind: "To say that an error did not contribute to the verdict is . . . to find that error *unimportant* in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates* v. *Evatt, supra,* 500 U.S. at p. 403 [114 L.Ed.2d at p. 449], italics added; accord, *Sullivan* v. *Louisiana, supra,* 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-189, 113 S.Ct. at pp. 2081-2082].)

But how are we to go about assessing the "importance" or "unimportance" of the instructional misdefinition?

*Yates* proceeds thus with regard to an instruction incorporating a mandatory rebuttable presumption of an element of a crime.

"[T]o say that an instruction to apply [such a] presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.

"Before reaching such a judgment, a court must take two quite distinct steps. First, it must ask what evidence the jury actually considered in reaching its verdict. . . . In answering this question, a court does not conduct a subjective enquiry into the jurors' minds. The answer must come, instead, from analysis of the instructions given to the jurors and from application of that customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so.

"Once a court has made the first enquiry into the evidence considered by the jury, it must then weigh the probative force of that evidence as against the probative force of the presumption standing alone. To satisfy *Chapman*'s reasonable doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. Since that enquiry cannot be a subjective one into the jurors' minds, a court must approach it by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." (*Yates* v. *Evatt, supra*, 500 U.S. at pp. 403-405 [114 L.Ed.2d at p. 449].)

Put differently, the first question is "whether the jury's verdict did rest on that evidence as well as on the presumptio[n] . . . ." (*Yates* v. *Evatt, supra*, 500 U.S. at p. 407 [114 L.Ed.2d at p. 451].)

The second question is "whether that evidence was of such compelling force as to show beyond a reasonable doubt that the presumptio[n] must have made no difference in reaching the verdict obtained"—in other words, whether the evidence of the presumed fact made the presumption superfluous. (*Yates* v. *Evatt, supra*, 500 U.S. at p. 407 [114 L.Ed.2d at p. 451].)

"It is only when the effect of the presumption is comparatively minimal to this degree that it can be said, in *Chapman*'s words, that the presumption did not contribute to the verdict rendered." (*Yates* v. *Evatt, supra*, 500 U.S. at p. 405 [114 L.Ed.2d at p. 449].)

By parity of reasoning, to say that the superior court's instructional misdefinition of the "immediate presence" element of the crime of robbery did not contribute to the verdict is to make a judgment about the significance of the instructional misdefinition to reasonable jurors, when considered against the other pertinent, and proper, instructions. We must first objectively determine what instructions relating to the "immediate presence" element the jury actually applied in reaching its verdict. We must then objectively assess the instructional misdefinition vis-à-vis the other pertinent and proper instructions in their relative importance. It is not sufficient that the jury could have rendered the same verdict in the absence of the instructional misdefinition. Rather, it is necessary that the jury actually rendered its actual verdict without reliance thereon. This turns on whether the other pertinent and proper instructions are so implicated on the record as to

compel a conclusion beyond a reasonable doubt that they must have made the instructional misdefinition superfluous. It is only if the instructional misdefinition is minimal in importance compared to the other pertinent and proper instructions that it can be held not to have contributed to the verdict.

On the record before us, we simply cannot say that the superior court's instructional misdefinition of the "immediate presence" element did not contribute to the verdict.

Objectively determined, the instructions relating to the "immediate presence" element that the jury actually applied in reaching its verdict were these.

First, there was the instructional statement of the "immediate presence" element itself. It properly declared that property must be taken from the victim's "person" or "immediate presence."

Second, there was the instructional misdefinition of the "immediate presence" element. It erroneously defined "immediate presence" as the area within which the victim could perceive, by some sense, some "overt act" connected with the offense.

Objectively assessed, the instructional misdefinition of the "immediate presence" element was substantial in relative importance vis-à-vis the instructional statement of the element.

The crucial question is whether the jury actually rendered its actual verdict finding defendant guilty of robbery without reliance on the instructional misdefinition of the "immediate presence" element. An affirmative answer cannot be given.

The instructional statement of the "immediate presence" element was not so implicated on the record as to compel a conclusion beyond a reasonable doubt that it must have made the instructional misdefinition of the element superfluous.

Recall that the evidence adduced at trial revealed that defendant could possibly be found guilty of robbery, as either a direct perpetrator or an aider and abettor, with regard to the taking of four items or groups of items belonging to the victim: (1) the victim's automobile and/or its contents; (2) the victim's wallet and/or its contents; (3) certain of the victim's possessions at his office; and (4) certain of the victim's possessions at his residence.

Although some of the takings of some of the items might satisfy the "immediate presence" element as from the victim's "person," most—as the prosecutor himself conceded—could do so only as from the victim's "immediate presence" as the area within which he could perceive, by some sense, some "overt act" connected with the offense. All the takings of all the items had at least been spoken of by defendant and/or one or more of his partners within the victim's hearing.

Recall further that the theory presented at trial by the People was that defendant was guilty of robbery, without specification, as either a direct perpetrator or an aider and abettor on the basis of any or all of the takings of any or all of the items; and that, as to the "immediate presence" element, that theory embraced "immediate presence" as the area within which the victim could perceive, by some sense, some "overt act" connected with the offense.

Manifestly, the People's theory required resort to the instructional misdefinition of the "immediate presence" element. It sought to reach every taking of every item by either defendant himself or any of his partners. It could do so only because "immediate presence" was misdefined as the area within which the victim could perceive, by some sense, some "overt act" connected with the offense—including the area within which he could hear defendant and/or any of his partners speak about the matter.

In view of the foregoing, we cannot conclude that the jury actually rendered its actual verdict finding defendant guilty of robbery without reliance on the instructional misdefinition of the "immediate presence" element. Surely, we cannot hold that the instructional statement of the element was so implicated on the record as to compel a conclusion beyond a reasonable doubt that it must have made the instructional misdefinition superfluous. Consistently with the People's evidence and their theory, the jury must quickly and easily have found the element satisfied as to every taking of every item by either defendant himself or any of his partners by relying on the instructional misdefinition, which was broad enough to embrace all the takings of all the items by anyone. Of course, with more time and effort, individual jurors might have proceeded to find the element satisfied as to one or more individual takings of one or more individual items by either defendant or one of his partners by determining, in accordance with the instructional statement, that *that* taking of *that* item by *that* perpetrator was strictly from the victim's "person." But why?

Since, for these reasons, the instructional misdefinition of the "immediate presence" element cannot be characterized as minimal in importance compared to the instructional statement of that element, it cannot be held not to have contributed to the verdict.

Therefore, the superior court's instructional misdefinition of the "immediate presence" element was reversible error under *Chapman.*

## C

## 1

Although the majority agree that the superior court's instructional misdefinition of the "immediate presence" element of the crime of robbery was erroneous under the United States Constitution, they conclude that the error was *not* reversible under *Chapman.* Their reasoning does not support their result.

In part, the majority appear to conclude that the instructional misdefinition of the "immediate presence" element was harmless under *Chapman* because the evidence was sufficient to support defendant's conviction. Not so, that "the . . . evidence was sufficient to support the [conviction]" does *not* mean that "the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*Satterwhite* v. *Texas* (1988) 486 U.S. 249, 258-259 [100 L.Ed.2d 284, 295, 108 S.Ct. 1792].) Obviously, if the evidence had been *in*sufficient, the conviction would be invalid as violative of the Fourteenth Amendment's due process clause (*Jackson* v. *Virginia, supra,* 443 U.S. at pp. 313-324 [61 L.Ed.2d at pp. 569-577]) and reprosecution of the underlying charge would be barred by the Fifth Amendment's double jeopardy clause as applied against the states by the Fourteenth Amendment's due process clause (*Greene* v. *Massey* (1978) 437 U.S. 19, 24 [57 L.Ed.2d 15, 20-21, 98 S.Ct. 2151]).

In other part, the majority appear to conclude that the instructional misdefinition of the "immediate presence" element was harmless under *Chapman* because, in conformity with *Clark* and *Pope,* we, as a reviewing court, "can find that the record developed at trial establishes guilt beyond a reasonable doubt . . . ." (*Rose* v. *Clark, supra,* 478 U.S. at p. 579 [92 L.Ed.2d at p. 471]; accord, *Pope* v. *Illinois, supra,* 481 U.S. at pp. 502-503 [95 L.Ed.2d at pp. 446-447].) I myself am persuaded of defendant's guilt. I assume my colleagues are as well. But such views do not matter—not even when they are ornamented, as by the majority, with a word like "overwhelming." *Yates* expressly declares *Clark* to be incorrect. *Sullivan* impliedly disapproves *Pope.* The jury is the proper entity to determine whether "the record developed at trial establishes guilt beyond a reasonable doubt" (*Rose* v. *Clark, supra,* 478 U.S. at p. 579 [92 L.Ed.2d at p. 471]); a reviewing court is not. (*Sullivan* v. *Louisiana, supra,* 508 U.S. at pp. __-__ [124 L.Ed.2d at pp.188-189, 113 S.Ct. at pp. 2081-2082].) In his concurring opinion in

*Carella*, Justice Scalia blocked the path that the majority would travel: "[M]isdescription of an element of the offense" is "not curable by overwhelming record evidence of guilt." (*Carella* v. *California, supra*, 491 U.S. at p. 270 [105 L.Ed.2d at p. 225] (conc. opn. of Scalia, J.).)

In still other part, the majority appear to conclude that the instructional misdefinition of the "immediate presence" element was harmless under *Chapman* because, on the evidence adduced, the jury could have or would have rendered a verdict of guilty in the absence of the error. Here too, I am persuaded and assume my colleagues are as well. But here too, such views do not matter.

*Yates* is pellucidly clear that it is "not . . . enough that the jury considered evidence from which it *could have* come to the verdict without reliance on the" error. (*Yates* v. *Evatt, supra*, 500 U.S. at p. 404 [114 L.Ed.2d at p. 449], italics added.)

And *Sullivan* is just as clear that it is not enough "that a jury *would surely have found* [the defendant] guilty beyond a reasonable doubt" absent the error. (*Sullivan* v. *Louisiana, supra*, 508 U.S. at p. __ [124 L.Ed.2d at pp. 189-190, 113 S.Ct. at p. 2082], italics in original.)

The majority imply that the question we must ask under *Chapman* is whether the evidence bearing on the "immediate presence" element, properly defined, was "overwhelming."

That is *not* the question we must or even may ask under *Chapman*. If it were, an instruction misdefining the beyond-a-reasonable-doubt standard would be amenable to harmless error analysis. *Sullivan* squarely holds it is not. (*Sullivan* v. *Louisiana, supra*, 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-190, 113 S.Ct. at pp. 2081-2082].)

If the error here involved the instructional *presumption* of an element of a crime, we would inquire, to quote *Yates*, "whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the *presumption*." (*Yates* v. *Evatt, supra*, 500 U.S. at p. 405 [114 L.Ed.2d at p. 449], italics added.) In other words, "whether that evidence was of such compelling force as to show beyond a reasonable doubt that the *presumptio[n]* must have made no difference in reaching the verdict obtained." (*Id.* at p. 407 [114 L.Ed.2d at p. 451], italics added.) In still other words, whether the evidence of the presumed fact made the *presumption* superfluous.

But since the error here involved the instructional *misdefinition* of an element of a crime and not the presumption thereof, we inquire, to follow the teaching of *Yates*, whether the other pertinent and proper instructions were so implicated on the record as to compel a conclusion beyond a reasonable doubt that they must have made the instructional misdefinition superfluous.

In this particular case: Was the instructional statement of the "immediate presence" element so implicated on the record as to compel a conclusion beyond a reasonable doubt that it must have made the instructional misdefinition of that element superfluous?

As explained, No. Consistently with the People's evidence and their theory, the jury must quickly and easily have found the "immediate presence" element satisfied as to every taking of every item by either defendant himself or any of his partners by relying on the instructional misdefinition, which was broad enough to embrace all the takings of all the items by any perpetrator. Individual jurors had no reason to expend more time and effort to proceed further to find the element satisfied as to one or more individual takings of one or more individual items by either defendant or one of his partners by determining, in accordance with the instructional statement, that *that* taking of *that* item by *that* perpetrator was strictly from the victim's "person."

In yet other part, the majority appear to conclude that the instructional misdefinition of the "immediate presence" element was harmless under *Chapman if* the jury relied instead on the instructional statement of that element covering a taking from the victim's "person." Their "if" is crucial. It is also unsupported. Indeed, as explained, the only reasonable inference is that the jury did in fact rely on the instructional misdefinition.

It follows that, under *Yates*, the instructional misdefinition of the "immediate presence" element cannot be found "*unimportant* in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates* v. *Evatt, supra*, 500 U.S. at p. 403 [114 L.Ed.2d at p. 449], italics added; accord, *Sullivan* v. *Louisiana, supra*, 508 U.S. at pp. __-__ [124 L.Ed.2d at pp. 188-189, 113 S.Ct. at pp. 2081-2082].) Under *Chapman*, therefore, the instructional misdefinition cannot be held not to have "contribut[ed] to the verdict obtained" "beyond a reasonable doubt." (*Chapman* v. *California, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at p. 710-711].) As a result, it was not harmless.

2

Although Justice Kennard in her concurring and dissenting opinion also agrees that the superior court's instructional misdefinition of the "immediate

presence" element of the crime of robbery was erroneous under the United States Constitution, she too concludes that the error was *not* reversible under *Chapman.* Her analysis is indeed thoughtful, but ultimately unpersuasive.[1]

I share the view that, in a situation in which the defendant admitted the element of the crime affected by an instructional error—which is *not* the case here—the error may perhaps be held harmless under *Chapman.* (E.g., *People v. Johnson* (1993) 6 Cal.4th 1, 60-61, fn. 2 [23 Cal.Rptr.2d 593, 859 P.2d 673] (conc. & dis. opn. of Mosk, J.).)

But I cannot accept the proposition that an instructional error affecting an element of a crime can be held harmless under *Chapman* if the defendant simply failed to dispute the underlying facts at trial.

The circumstances with which we are concerned assume that the defendant had entered a plea of not guilty—which put into dispute all the facts underlying all the elements constituting all the crimes charged (see Pen. Code, § 1019)—and had been tried by a jury—which was entrusted with the resolution of such facts in their entirety (see *People v. Rowland* (1992) 4 Cal.4th 238, 260 [14 Cal.Rptr.2d 377, 841 P.2d 897]).

Justice Kennard appears to reason thus: a defendant's Sixth Amendment right to trial by jury does not extend to facts underlying an element of a crime that he fails to dispute at trial, and hence is not violated by an instructional error affecting the finding of such facts. Or phrased somewhat differently: A "defendant is [not] entitled to have the jury decide [any] issue of fact material to guilt" that is "undisputed" at trial. (Conc. & dis. opn. of Kennard, J., *post*, at p. 463.) I am not persuaded.

---

[1]At the outset, I disagree that "determining and applying the federal harmless error standard in a case like this" is "difficul[t]." (Conc. & dis. opn. of Kennard, J., *post*, at p. 461; see *id.* at pp. 452, 456.) Notwithstanding the implication to the contrary, there is no conflict between *Yates* and *Sullivan*, on the one side, and *Clark* and *Pope*, on the other. Rather, *Yates* expressly declares *Clark* to be incorrect and *Sullivan* impliedly disapproves *Pope.* It is true that in *U.S. v. Whiting* (1st Cir. 1994) 28 F.3d 1296, 1309, the court claimed to experience a similar "difficulty" as to harmless error analysis. But it did so only because it failed to recognize the effect of *Yates* and *Sullivan* on *Clark* and *Pope.*

I also disagree that we stand in need of "guidance" from the United States Supreme Court. (Conc. & dis. opn. of Kennard, J., *post*, at p. 462; see *id.* at p. 461.) We are under a solemn obligation to interpret and implement the United States Constitution. We are no less capable of discharging that duty than any other court. We "should disabuse [ourselves] of the notion that in matters of constitutional law and criminal procedure we must always play Ginger Rogers to the high court's Fred Astaire—always following, never leading." (*People v. Cahill* (1993) 5 Cal.4th 478, 557-558 [20 Cal.Rptr.2d 582, 853 P.2d 1037] (dis. opn. of Kennard, J.).) Of course, that court may decide to depart from its own precedents. But we cannot predict, and hence should not even attempt to anticipate, such changes in course. In any event, since our oath is to the Constitution and not to the court, we should put the matter out of mind altogether.

The Sixth Amendment right to trial by jury, *Sullivan* explains, "includes, . . . , as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' . . .

"What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements . . . .

"It is self-evident . . . that the [Fourteenth] Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated." (*Sullivan* v. *Louisiana, supra,* 508 U.S. at pp. __-__ [124 L.Ed.2d at p. 188, 113 S.Ct. at pp. 2080-2081].)

Accordingly, "[i]t would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine . . . whether he is guilty beyond a reasonable doubt." (*Sullivan* v. *Louisiana, supra,* 508 U.S. at p. __ [124 L.Ed.2d at p. 188, 113 S.Ct. at p. 2081], italics in original.)

Similarly, it would not satisfy the Sixth Amendment to have a jury resolve *some of the facts* underlying the elements of the crime of which it determines the defendant guilty, and then leave it up to a judge to resolve the rest.[2]

The unsoundness of Justice Kennard's analysis reveals itself in the untenable result that it yields.

To quote: "I do not mean to suggest that if all facts material to guilt were undisputed, the trial court could direct a verdict for the government or dispense with a jury verdict entirely and enter a judgment of conviction. I understand the Sixth Amendment to the federal Constitution as requiring a guilt determination by the jury, not by the court, even where the material facts are undisputed. What I am suggesting is that once the jury has made that determination, misinstruction on any single element of the charged offense, *or indeed on every element of the offense,* will be harmless if the element or elements in question were established by undisputed facts." (Conc. & dis. opn. of Kennard, J., *post,* at p. 459, fn. 3, italics in original.)

---

[2]All this is not to say that a defendant may not waive his Sixth Amendment right to trial by jury, in whole or in part, in the course of the proceedings. Before trial, such a waiver must be knowing and voluntary. (*Boykin* v. *Alabama* (1969) 395 U.S. 238, 242-244 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709].) During trial, the same is true. (Cf. *People* v. *Adams* (1993) 6 Cal.4th 570, 582 [24 Cal.Rptr.2d 831, 862 P.2d 831] [speaking of a stipulation of a fact].) Having reviewed the record in its entirety, I cannot find that defendant waived his right to any extent.

The foregoing passage necessarily suggests that, although it would be *error* for a "trial court [to] direct a verdict for the government or dispense with a jury verdict entirely and enter a judgment of conviction," it would nevertheless be *harmless* if the elements of the offense were established, to a reviewing court's satisfaction, by facts that the defendant failed to dispute at trial.

That, however, cannot be the law. Indeed, it *is not* the law. *Sullivan* makes plain that "directed verdicts for the State" are not "sustainable on appeal . . . ." (*Sullivan* v. *Louisiana, supra,* 508 U.S. at p. __ [124 L.Ed.2d at p. 190, 113 S.Ct. at p. 2082].)[3]

Let us assume, for argument's sake, that Justice Kennard's analysis is sound to this point. She proceeds thus: The instructional misdefinition of the "immediate presence" element was harmless under *Chapman* because defendant failed to dispute at trial the facts establishing "immediate presence," along with the other elements of the crime of robbery, as to the taking of the wallet from the victim's "person."

Unlike Justice Kennard, I cannot discern defendant's *undisputed* guilt as a direct perpetrator of robbery. She asserts that "the force used to effect the taking of the wallet had not ceased when defendant joined the enterprise." (Conc. & dis. opn. of Kennard, J., *post,* at p. 460.) Her implication seems to be that defendant participated in *taking* the item. He simply did not. Of course, he evidently participated in *retaining* the item. That, however, is another matter.

Unlike Justice Kennard, I also cannot discern defendant's *undisputed* guilt as an aider and abettor of robbery. She asserts that, under the rule of *People* v. *Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742] (hereafter sometimes *Cooper*), "[f]or purposes of determining liability as an aider and abettor, 'the commission of a robbery continues until all acts constituting the offense have ceased.' " (Conc. & dis. opn. of Kennard, J., *post,* at p. 460, quoting with editorial modification *People* v. *Cooper, supra,* 53 Cal.3d at p. 1164.) The rule laid down by *Cooper* was new, and indeed novel. (*People* v. *Cooper, supra,* 53 Cal.3d at pp. 1171-1179 (dis. opn. of Kennard,

---

[3]It is true that in *U.S.* v. *Warren* (9th Cir. 1993) 984 F.2d 325, 327, the court stated—with a quotation from one of its own relatively old decisions, *United States* v. *King* (9th Cir. 1978) 587 F.2d 956, 966, and without even a citation to any of the more recent United States Supreme Court decisions bearing on the issue, such as *Yates* and *Sullivan*—that " 'The failure to instruct on every element of an offense is harmless error . . . if the omitted element is undisputed . . . .' " In *U.S.* v. *Gaudin, supra,* 28 F.3d at page 951, the court, sitting in bank, effectively repudiated that statement, holding that, under *Yates* and *Sullivan*, the omission of an element of an offense "cannot be harmless."

J.).) Defendant was tried before *Cooper*. In fairness, he should not be penalized on appeal for failing to anticipate its applicability to his case. " '[A] defendant in a criminal trial is justified, of course, in defending solely in reliance on the presumption of his innocence and the State's burden of proof.' " (Conc. & dis. opn. of Kennard, J., *post*, at p. 458, fn. 2, quoting *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 87, fn. 16 [74 L.Ed.2d 823, 835, 103 S.Ct. 969] (plur. opn. by Blackmun, J.).) If defendant had been tried after *Cooper*, he might have so defended.

## IV

For the reasons stated above, although I would generally affirm defendant's convictions, I would reverse as to robbery and the related crimes of murder and kidnapping for robbery.

**KENNARD, J., Concurring and Dissenting.**—The jury in this case, after receiving instructions from the trial court that erroneously defined one element of robbery, returned verdicts convicting defendant of robbery and certain robbery-related offenses. On defendant's appeal, the Court of Appeal reversed these convictions. This court granted review to decide whether, as the Court of Appeal concluded, the erroneous jury instruction so tainted the verdicts on the robbery and robbery-related offenses as to require that the convictions be reversed and the matter retried.

The determination of prejudice presents unusual difficulties. The charge of robbery was presented to the jury under alternative factual theories involving the taking of different items of property at different times from the same victim, the erroneous instruction was clearly misleading as to some theories but not others, and the verdict does not disclose which theory or theories the jury accepted. Because the error implicates the right to jury trial under the federal Constitution, the determination of prejudice must be made according to federal standards set by the United States Supreme Court, but the high court's recent decisions leave room for doubt as to the correct analytical approach in cases such as this one.

The majority's analysis I find difficult to follow. As I understand it, the majority concludes that the instructional error was not prejudicial because we as a reviewing court may infer that the jury actually rested its robbery verdict on a factual theory or theories as to which the erroneous instruction was not implicated. We may so infer, the majority reasons, because the evidence in support of guilt on those theories was so overwhelming as to establish guilt as a matter of law. I am not persuaded, however, that the relevant decisions of the United States Supreme Court permit us to draw such an inference about the actual basis of a jury's verdict.

I agree that defendant was not prejudiced by the instructional error, but I arrive at this conclusion by a different approach that, in my view, is more

easily reconciled with federal precedent. What makes the error harmless, under this approach, is that defendant, through his testimony at trial and his attorney's argument to the jury, admitted every fact needed to prove his guilt of the crime of robbery. Because the elements of robbery were established by undisputed facts, there were no factual issues for the jury to decide and therefore it is of no constitutional significance that, for all we know, the jury may have relied to some extent on the erroneous instruction in reaching its guilty verdict on the robbery charge.

Were this not a case of guilt established by undisputed facts, reversal of the robbery conviction would appear to be required by controlling decisions of the United States Supreme Court, as explained in the dissenting opinion of Justice Mosk. Because this *is* a case of guilt established by undisputed facts, and not simply a case of overwhelming evidence of guilt, I do not join Justice Mosk in dissent.

I

The relevant facts are these:

Three young men were attempting to steal an automobile when its owner appeared. The young men subdued the vehicle's owner, whom they took, along with his automobile, to a house where defendant was staying. One of the young men entered the house and told defendant what had happened, while the other two remained outside with their captive. Defendant, whom the others regarded as their leader, gave instructions to bind and blindfold the victim. When his instructions had been carried out (using handcuffs defendant had supplied), defendant went out to the automobile in which the victim was confined. One of the young men handed defendant the victim's wallet. Defendant removed and kept for himself the money he found in the wallet.

Thereafter, defendant and the three members of his "team" proceeded to loot the victim's home and business and to use the victim's automatic teller machine access cards to obtain money from his accounts. Defendant was a full participant in these activities, and it was defendant who rented a motel room in which the victim was confined against his will. In defendant's absence, the others took the victim to a remote location where they shot him to death. When informed of the murder, defendant assisted in concealing the body, withdrew more money from the victim's accounts, and attempted to sell the victim's automobile.

During his testimony at trial, defendant admitted each of these facts, although he maintained that his initial motive in assisting the kidnapping was merely to control the behavior of his subordinates so that the situation would not get out of hand.

In argument to the jury, defendant's trial attorney conceded that defendant was guilty of most of the crimes with which he was charged, including kidnapping, three counts of burglary, two counts of auto theft, grand theft of a firearm, and fraudulent use of bank access cards. Defense counsel challenged only the charges of robbery, kidnapping for robbery, and murder.

Regarding the robbery charge, defense counsel conceded that defendant's three companions had committed robbery by forcibly taking the victim's automobile, his keys, and his wallet. But counsel argued that, as to the taking of these items, the crime of robbery had terminated before defendant joined the enterprise, and therefore defendant was guilty not of robbery but only of the lesser offense of receiving stolen property. Counsel conceded that defendant had participated in the later thefts from the victim's home, business, and bank accounts, but counsel argued that none of these thefts would support a robbery conviction because none of the items had been taken from the victim's person or immediate presence.

The prosecutor, in argument to the jury, disputed defense counsel's assertion that the robbery involving the taking of the victim's automobile, keys, and wallet had ceased before defendant joined the enterprise. He argued that the robbery was ongoing so long as the robbers were "encumbered" with the robbery victim and that defendant, by assisting in the restraint and transportation of the victim, had aided and abetted the continuing robbery. But the prosecutor did not limit the robbery charge to the taking of the victim's automobile, keys, and wallet. He also argued that defendant could be found guilty of the robbery charge based on the later thefts from the victim's house and business. Relying on an erroneous jury instruction that an act of robbery occurs in the immediate presence of the victim so long as the victim perceives any overt act connected with the offense, the prosecutor argued that the "immediate presence" element was satisfied because the victim had overheard conversations in which the "team" discussed plans to loot the victim's residence and business and because those who participated in these takings had questioned the victim about what they would find inside.[1]

---

[1]"Now, the judge told you yesterday what that meant. An act of robbery occurs in the immediate presence of the person who is robbed as long as that person perceives any overt, any overt act connected with the offense.

"Now, when you look at that issue, you are to look at all of that person's perceptual abilities: namely, his ability to see, his ability to hear, and the other sensory perceptions that a person might have.

"What about the items that were taken from the business? They weren't taken from his person. They weren't taken from his immediate presence. He wasn't in actual possession, but he had constructive possession of those items of property. Taken from his immediate presence because he was able to perceive several overt acts associated with the taking of that property. When he was *sitting out in front of Shon Maple's house*, clearly he must have heard them

## II

In this state, robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) Thus, one of the elements of robbery is that the personal property of the victim be taken either from the victim's *person* or from the victim's *immediate presence.* In *People v. Hayes* (1990) 52 Cal.3d 577, 626-628 [276 Cal.Rptr. 874, 802 P.2d 376], this court held that the term "immediate presence," as used in the definition of robbery, means that the property is " ' "so within [the victim's] reach, inspection, observation or control" ' " that the victim could have retained possession had the victim not been prevented or deterred from doing so by the perpetrator's use of force or fear.

This case was tried before this court's decision in *People v. Hayes, supra,* 52 Cal.3d 577. Instructing the jury on the meaning of "immediate presence" as used in the definition of robbery, the trial court told the jury: "The act of robbery is deemed to have occurred within the immediate presence of a victim so long as the victim perceived any overt act connected with the commission of the offense. Any and all of the sensory perceptions of the victim are to be considered in determining presence." As this court explained in *People v. Hayes,* this instruction is erroneous because it deprives the term "immediate presence" of any independent meaning, making it duplicative of the "force or fear" element of robbery. (*Id.* at pp. 627-628.)

When a trial court, in instructions to the jury, incorrectly defines one of the elements of the crime with which the defendant is charged, the defendant's conviction of that crime can be affirmed on appeal only if the reviewing court is persuaded beyond a reasonable doubt that the error did not "contribute to" the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see also *Pope v. Illinois* (1987) 481 U.S. 497, 502 [95 L.Ed.2d 439, 446, 107 S.Ct. 1918]; *People v. Hayes, supra,* 52 Cal.3d 577, 628.) To determine whether an error "contributed to" a verdict, a reviewing court does not ask whether a hypothetical jury in a hypothetical trial in which the error did not occur would

---

talking about going back to the business. On the way to the business, Valdez F[.] was asking him questions. Once at the business, there was a point in time when Shon Maple—and again, this is before any property is taken—specifically asked [the victim] about the building that he had come out of.

"I suggest to you, ladies and gentlemen, that these overt acts associated with the commission of the taking of that property made the taking of that property within [the victim]'s immediate presence as defined by the law, even though [the victim] was out in the car at the time the items were taken."

surely have reached the same verdict. (*Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d at pp. 182, 188-189, 113 S.Ct. 2078, 2081].) Rather, the reviewing court must ask whether the guilty verdict actually rendered in this trial was "surely unattributable to the error." (*Ibid.*) This is because the Sixth Amendment right to jury trial means that the jury, and not a reviewing court, must find beyond a reasonable doubt every fact needed to convict.

To determine whether a verdict was "surely unattributable" to a trial error, the reviewing court ordinarily should first determine what evidence the jury actually considered in reaching its verdict by analyzing the trial evidence in light of the instructions, presuming that the jury considered relevant evidence when told it might do so. Next, the reviewing court must weigh the evidence properly considered against any tainted evidence or other improper jury influence resulting from the error. The conviction may be upheld only if this weighing process shows that the improper influence was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates* v. *Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 449, 111 S.Ct. 1884].)

In this case, the task of assessing harmless error by means of the described analysis is complicated because (1) the prosecutor urged the jury to base its robbery verdict on any of several different takings, (2) the jury's verdict does not disclose which taking or takings the jury based its verdict upon, and (3) the significance of the instructional error varies greatly depending upon which taking or takings the jury considered in reaching its verdict.

If the jury based its robbery verdict on the taking of the victim's wallet, for example, the instructional error would be inconsequential. The wallet was taken from the victim's person, and because robbery may be committed by a taking from *either* the person *or* the immediate presence of the victim, the jury would never have occasion to apply the definition of "immediate presence" if it based its verdict entirely upon a taking from the victim's person. On the other hand, if the jury based its robbery verdict on the thefts from the victim's residence, the instructional error would most likely be prejudicial. These thefts did not consist in the taking of items from the victim's person, and whether the items were taken from the victim's immediate presence presented a factual issue for the jury. (See *People* v. *Hayes*, *supra*, 52 Cal.3d 577, 628-629.) Because the jury presumably would have used the erroneous "immediate presence" instruction to decide this issue, it would have proceeded by asking the wrong questions and would never have made the required factual determination.

The majority evidently believes that we, as a reviewing court, may infer that the jury rested its robbery verdict on the taking of the wallet or similar

items from the victim's person because the prosecution's evidence in support of this robbery theory was so strong as to establish defendant's guilt as a matter of law. But, when viewed in the distorting light of the erroneous jury instruction on "immediate presence," the evidence that defendant was guilty of robbery for the thefts from the victim's home and residence may well have seemed equally compelling. To base the robbery verdict on the taking of the wallet and other items from the victim's person, the jury would have had to decide whether the robbery as to these items had terminated before defendant's involvement. To base the robbery verdict on the takings from the victim's home or residence, the jury would have had to decide whether the taking of these items satisfied the element of immediate presence. Either theory would require the jury to resolve an issue that was vigorously contested by counsel in closing argument. Given the trial court's instructions (including the erroneous "immediate presence" instruction) and counsel's arguments, these alternative theories might well have appeared equally problematic, or equally sound, to a reasonable juror. How then can a reviewing court be confident, beyond a reasonable doubt, that the jury *actually rested* its verdict on the taking of the wallet or some other item from the victim's person?

Justice Mosk's concurrence and dissent takes the view that because the verdict does not reveal which robbery theory or theories the jury relied upon, and because it is certainly conceivable, if not likely, that the jury based the robbery verdict in whole or in part upon a theory as to which the "immediate presence" instruction would have been prejudicially misleading, a reviewing court may not say beyond a reasonable doubt that the robbery verdict was "surely unattributable" to the instructional error. Although I agree with Justice Mosk's concurrence and dissent that we, as a reviewing court, may not infer that the jury actually rested its verdict on a taking from the victim's person, nonetheless there appears to be a sound basis upon which to conclude that defendant was not prejudiced by the erroneous jury instruction.

Under the United States Supreme Court's decisions in *Yates* v. *Evatt*, *supra*, 500 U.S. 391, and *Sullivan* v. *Louisiana, supra,* 508 U.S. __ [124 L.Ed.2d 182, 113 S.Ct. 2078], the focus of the harmless error analysis is upon the verdict actually rendered in this case, not the verdict that would have been rendered in a hypothetical trial free of the instructional error. Thus, if an instructional error prevents the jury from making a necessary factual finding, it is generally irrelevant that the evidence supporting that finding was overwhelming. In the words of Justice Scalia, "misdescription of an element of the offense . . . deprives the jury of its factfinding role" and thus is "not curable by overwhelming record evidence of guilt." (*Carella* v. *California* (1989) 491 U.S. 263, 270 [105 L.Ed.2d 218, 225, 109 S.Ct. 2419] (conc. opn. of Scalia, J.).)

Here, however, the record shows not merely overwhelming evidence, but undisputed facts. The distinction is critical, as I shall explain.

The United States Supreme Court commented on the role of undisputed facts in harmless error analysis in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969]. There, the trial court had instructed the jury that " 'the law presumes that a person intends the ordinary consequences of his voluntary acts.' " (*Id.* at pp. 74-75 [74 L.Ed.2d at p. 826].) The high court had previously held, in *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], that such an instruction violates the due process clause of the Fourteenth Amendment. In *Connecticut* v. *Johnson,* four justices of the United States Supreme Court joined in a plurality opinion stating that when such an erroneous instruction has been given, a reviewing court may not find the error harmless on the basis that the evidence of criminal intent was overwhelming. (460 U.S. at p. 85 [74 L.Ed.2d at p. 833].) But the plurality also stated that the error might be found harmless if the fact of criminal intent was undisputed: "[A] *Sandstrom* error may be harmless if the defendant conceded the issue of intent. [Citations.] In presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless." (*Id.* at p. 87 [74 L.Ed.2d at p. 835].)[2] Justice Stevens concurred in the judgment but declined to reach the issue of harmless error. (*Id.* at p. 88 [74 L.Ed.2d at pp. 835-836].) The four dissenting justices would have adopted a less restrictive harmless error analysis. (*Id.* at pp. 98-99 [74 L.Ed.2d at pp. 835-836].) Thus, all but one member of the high court gave assent to the proposition that an instructional error effectively removing an issue from the jury's consideration may be harmless if the defendant conceded the issue.

In a concurring opinion joined by three other justices, Justice Scalia has likewise acknowledged that instructional error effectively taking an issue from the jury may be deemed harmless when it relates to "an element of the crime that the defendant in any case admitted." (*Carella* v. *California, supra,* 491 U.S. 263, 270 [105 L.Ed.2d 218, 225] (conc. opn. of Scalia, J.).) Although the United States Supreme Court has not yet directly held that undisputed facts may render harmless a trial court's error in misdefining an element of a charged offense, I am persuaded, based on this concurring

---

[2]In a footnote, the plurality noted that "a defendant in a criminal trial is justified, of course, in defending solely in reliance on the presumption of his innocence and the State's burden of proof." (*Connecticut* v. *Johnson, supra,* 460 U.S. 73, 87, fn. 16 [74 L.Ed.2d 823, 835].) In other words, a fact becomes undisputed in a criminal trial only if the defense affirmatively concedes it.

opinion by Justice Scalia and on the plurality opinion in *Connecticut* v. *Johnson*, *supra*, 460 U.S. 73, that it would so conclude. (See also *U.S.* v. *Warren* (9th Cir. 1993) 984 F.2d 325, 327 [stating that failure to instruct on an element of an offense is harmless if the omitted element was undisputed].)

Why is it that instructional error may be "cured" by undisputed facts but not by overwhelming evidence? When a fact is undisputed, it is reasonable to assume that the jury accepted it as true, because ordinarily the jury would have no reason to do otherwise. But it does not follow that the jury actually rested its verdict on the undisputed fact. An erroneous jury instruction may cause a jury to dismiss as irrelevant an undisputed fact that is essential to the guilt determination. Thus, an undisputed fact does not "cure" an instructional error by providing assurance that the jury actually rested its verdict on the undisputed fact.

The reason undisputed facts "cure" instructional error may be found in the nature of the constitutional guarantee of jury trial. In criminal cases, the right to jury trial is, primarily, a right to have the jury rather than a court decide every "issue of fact" arising in the trial of the criminal charge. But when a fact is undisputed, or the parties have stipulated to its existence, there is no "issue of fact" for the jury to resolve, and this aspect of the Sixth Amendment right to jury trial is not implicated.[3] Otherwise stated, the federal Constitution gives an accused no right to have the jury decide the truth of a fact that the accused has elected not to contest.

Here, every fact needed to convict defendant of robbery based on the taking of the victim's wallet was undisputed at defendant's trial. It was undisputed (1) that defendant or a member of his team took the wallet from the victim's person; (2) that the wallet was taken against the victim's will; (3) that the taking was accomplished by force; and (4) that defendant and his companions intended to permanently deprive the victim of at least the cash contained in the wallet, if not the wallet itself. Defendant disputed none of these facts, admitting them through his testimony and through his lawyer's argument to the jury. In that jury argument, defense counsel relied upon a theory that although the victim had been robbed of his wallet, the robbery

---

[3] I do not mean to suggest that if all facts material to guilt were undisputed, the trial court could direct a verdict for the government or dispense with a jury verdict entirely and enter a judgment of conviction. I understand the Sixth Amendment to the federal Constitution as requiring a guilt determination by the jury, not by the court, even where the material facts are undisputed. What I am suggesting is that once the jury has made that determination, misinstruction on any single element of the charged offense, *or indeed on every element of the offense*, will be harmless if the element or elements in question were established by undisputed facts.

had terminated before defendant received the wallet, and therefore defendant was guilty only of receiving stolen property. This theory was legally defective; the purported defense was no defense at all.

The flaw in counsel's theory of defense is apparent upon review of the law of aiding and abetting. For purposes of determining liability as an aider and abettor, "the commission of a robbery continues until all acts constituting the offense have ceased." (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742], italics & fn. omitted.) And this court has recently emphasized that "in determining the duration of an offense, for the purpose of aider and abettor liability, the court must take into account the nature of the interests that the penal provision is intended to protect." (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1040 [31 Cal.Rptr.2d 128, 874 P.2d 903].) This court noted also that "both the victim of a crime and a potential aider and abettor frequently will not perceive an offense as 'completed' simply because all elements necessary to establish guilt already have been satisfied." (*Ibid.*)

Here, the force used to effect the taking of the wallet had not ceased when defendant joined the enterprise. The members of defendant's team had overpowered the victim and brought him directly to defendant. The victim was still being forcibly restrained and held captive when defendant obtained the wallet. Thus, the acts constituting the robbery of the wallet (that is, the application of force or fear to separate the victim from his property) had not ceased. (See *People* v. *Cooper, supra,* 53 Cal.3d 1158, 1164.) Moreover, robbery is punished to protect the victim's interests in avoiding both loss of property and physical harm. (*People* v. *Guerin* (1972) 22 Cal.App.3d 775, 782 [99 Cal.Rptr. 573].) Consideration of these interests dictates that a robbery not be considered terminated while the robbers continue to hold the victim's property and the victim remains their captive and at risk of immediate physical harm.

Here, by appropriating the wallet that had been forcibly taken from the victim, with the intent to permanently deprive the victim of the cash in the wallet, and by knowingly and intentionally assisting in the victim's continued restraint, defendant joined the continuing robbery either as an aider and abettor or as an additional direct perpetrator.

## III

The diversity of views reflected in the several opinions authored in this court suggests that the controlling federal prejudice standard is not as clear

as it might be, and that further elucidation by the United States Supreme Court would be useful.[4]

The difficulty of determining and applying the federal harmless error standard in a case like this becomes apparent upon examination of the high court's decision in *Pope* v. *Illinois, supra,* 481 U.S. 497, which involved a prosecution for selling pornographic literature. In its instructions to the jury, the trial court had erroneously instructed the jury to use "contemporary community standards," rather than an objective "reasonable person" standard, to determine whether the allegedly obscene material lacked serious literary, artistic, political, or scientific value. (See *Smith* v. *United States* (1977) 431 U.S. 291, 301 [52 L.Ed.2d 324, 334-335, 97 S.Ct. 1756]; *Miller* v. *California* (1973) 413 U.S. 15, 24 [37 L.Ed.2d 419, 430-431, 93 S.Ct. 2607].) The United States Supreme Court held that the instructional error, because it did not entirely preclude the jury from considering the question of value, would be harmless if "no rational juror, if properly instructed, could find value in the magazines" (*Pope* v. *Illinois, supra,* 481 U.S. at p. 503 [95 L.Ed.2d at p. 447]), and it remanded the case to a state court for the resolution of this question.

Justice Stevens dissented, taking the position that misinstruction on an element of an offense could not be harmless: "It is fundamental that an appellate court (and for that matter, a trial court) is not free to decide in a criminal case that, if asked, a jury *would* have found something that it did not find. We have consistently rejected the possibility of harmless error in these circumstances." (*Pope* v. *Illinois, supra,* 481 U.S. 497, 509-510 [95 L.Ed.2d 439, 451] (dis. opn. of Stevens, J.).)

Although this was the most recent case in which the United States Supreme Court has explained the harmless error analysis that a reviewing court should use when a trial court's jury instructions incorrectly defined an element of a charged offense, and although the holding in that case has not been expressly overruled, there are grounds to doubt that the harmless error analysis set forth in the majority opinion in *Pope* v. *Illinois, supra,* 481 U.S. 497, has continuing vitality as precedent.

---

[4]Quoting from my dissenting opinion in *People* v. *Cahill* (1993) 5 Cal.4th 478, 554 [20 Cal.Rptr.2d 582, 853 P.2d 1037], Justice Mosk argues that we stand in no need of "guidance" from the United States Supreme Court because we are "no less capable . . . than any other court" of interpreting the federal Constitution. (Conc. and dis. opn. of Mosk, J., *ante,* p. 449, fn. 1.) But the quotation from *Cahill* is taken out of context. In that case, this court was interpreting our state Constitution and therefore was under no obligation to follow holdings of the United States Supreme Court construing similar provisions in the federal Constitution. On matters of federal constitutional law, such as application of the federal harmless error standard under *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711], the situation is otherwise. The United States Supreme Court's rulings are binding on this court. (See, e.g., *People* v. *Clair* (1992) 2 Cal.4th 629, 662 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

As authority for its harmless error methodology, the court had relied on one of its earlier decisions: "The situation here is comparable to that in *Rose* v. *Clark* 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] (1986). In *Rose*, the jury in a murder trial was incorrectly instructed on the element of malice, yet the Court held that a harmless-error inquiry was appropriate. The Court explained that in the absence of error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge, a conviction should be affirmed '[w]here a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt . . . .' *Id.*, at 579." (*Pope* v. *Illinois, supra*, 481 U.S. 497, 502-503 [95 L.Ed.2d 439, 446], fn. omitted.)

Just four years later, the court stated that this very language (that misinstruction on an element of an offense is harmless " '[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt' ") was, at least when viewed in isolation, "not correct." (*Yates* v. *Evatt, supra*, 500 U.S. 391, 402-403, fn. 8 [114 L.Ed.2d 432, 448].)

In a still later case, the high court approvingly cited Justice Stevens's dissent in *Pope* v. *Illinois, supra*, 481 U.S. 497, for the proposition that "to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." (*Sullivan* v. *Louisiana, supra*, 508 U.S. __, __ [124 L.Ed.2d 182, 189, 113 S.Ct. 2078, 2082].)

Thus, it would seem that the harmless error analysis prescribed in *Pope* v. *Illinois, supra*, 481 U.S. 497, has been disapproved and replaced by the form of analysis outlined in *Yates* v. *Evatt, supra*, 500 U.S. 391, and *Sullivan* v. *Louisiana, supra*, 508 U.S. __ [124 L.Ed.2d 182, 113 S.Ct. 2078]. Yet the high court has not itself applied the newer mode of analysis to a jury instruction misdefining an element of a charged offense, but only to jury instructions containing improper presumptions or misdefining the "reasonable doubt" standard of proof. And the high court has never attempted to apply the *Yates/Sullivan* analysis to a situation, such as presented in this case, in which the jury is given alternative factual theories of guilt, the verdict does not disclose which theory or theories the jury accepted, and the erroneous instruction would be misleading as to some theories of guilt but not others. Lacking firm guidance from the high court in situations directly analogous to the one we face here, this court's resolution of the harmless error problem must of necessity involve a certain degree of inference and

informed speculation based on our readings of the pertinent decisions of the high court.[5]

## IV

Although a defendant is entitled to have the jury decide every issue of fact material to guilt, facts that are undisputed do not raise "issues of fact." Here, the verdict convicting defendant of robbery may be deemed to incorporate findings of each material undisputed fact, and those findings establish every element of robbery. Applying the federal harmless-error standard as best I am able to determine it, I conclude beyond a reasonable doubt that the robbery verdict against defendant was "surely unattributable to the error" that the trial court committed when it instructed the jury with an incorrect definition of the "immediate presence" element of robbery.

---

[5]At least one federal court agrees that there is ambiguity in the current state of law. In a recent opinion, the First Circuit remarked: "One might, or might not, read recent Supreme Court decisions to mean that where an incorrect instruction [on an element of an offense] is given, it may not be adequate for the government to show that the record evidence assured that a reasonable jury under proper instructions would have found the disputed element in favor of the government; rather, it may be the law that the jury must in fact have made this finding despite the erroneous instruction." (*U.S.* v. *Whiting* (1st Cir. 1994) 28 F.3d 1296, 1309, fn. omitted.)